**GENERAL LEASEWAYS, INC.,**
**Plaintiff-Appellee,**

**v.**

**NATIONAL TRUCK LEASING ASSOCI-ATION, d/b/a National Truck Leasing System, et al., Defendants-Appellants.**

**No. 83–3173.**

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1984.

Decided Sept. 19, 1984.

As Amended Oct. 31, 1984.

Jeffrey M. Cross, Karen K. Phillips, Ross & Hardies, Chicago, Ill., for plaintiff-appellee.

Rodney D. Joslin, Jenner & Block, Chicago, Ill., for defendants-appellants.

Before POSNER and FLAUM, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

[*] Hon. William J. Campbell, of the Northern Dis-

POSNER, Circuit Judge.

The defendants in this antitrust suit appeal under 28 U.S.C. § 1292(a)(1) from the grant of a preliminary injunction to the plaintiff, General Leaseways, a company engaged in the business of leasing trucks. The principal (and to simplify this opinion we shall assume the only) defendant is an association of such firms, the National Truck Leasing Association, which decided to suspend General Leaseways indefinitely—the practical equivalent of expelling it.

The roughly 130 members of the Association lease trucks to businesses on a "full service" basis. This means that the lessor rather than the lessee is responsible for maintaining the trucks and for repairing them if they break down. The leases are short term or long term, local or "over the road." The last of these terms, which means that the lessee may drive the truck anywhere in the country, is critical to this case. Over-the-road customers demand full service. The members of the Association, however, are local companies, none of which owns service facilities throughout the nation. The Association was created in order to set up and administer a reciprocal service arrangement that would enable each member to lease trucks on a full-service over-the-road basis and thus compete with the national truck-leasing companies, which have their own service depots all over the United States. The rules of the Association require each member to give the trucks of the other members prompt and efficient repair service; this is the reciprocal service arrangement. The rules do not regulate the price of the service.

Although reciprocal service is the Association's *raison dêtre*, the members also exchange information of a type normally exchanged through a trade association, engage in some other joint programs (including joint purchasing of fuel), and share a trademark owned by the Association, "NationaLease." But neither the Association nor its members advertise or otherwise promote the trademark extensively, and most

trict of Illinois, sitting by designation.

members do not even use the mark in their business names.

If this were all there was to the Association, there would be no antitrust controversy. But there is more. Each member operates under a franchise from the Association that designates the particular location at which he may do business as a National franchisee and forbids him to do business as a National franchisee at any other location. The rules of the Association also forbid the franchisee to affiliate with any other full-service truck-leasing enterprise, such as Hertz or Avis. The significance of the location restriction and the nonaffiliation requirement lies in the fact that the markets for full-service commercial truck leases are local: the lessee invariably leases the truck from a firm having an outlet within a few miles (no more than 25) of the lessee's place of business. For short-term leases the inconvenience of sending the lessee's driver a longer distance to pick up the truck is decisive. For long-term leases the decisive factor is that regular maintenance (as distinct from emergency repair) is part of the full-service package and is therefore provided at the outlet from which the truck is rented. In either case one truck-leasing firm can compete with another only if it has a sales and service outlet near the other's. But the Association's policy is to space franchise locations 10 or (more commonly) 20 miles apart, so that franchisees will not be able to compete for many of the same customers. The franchisee can if he wants open an outlet at an unauthorized location under a different name, but trucks rented under that name would not be entitled to reciprocal service; and even if the member were willing to forgo that advantage, he still could not open an outlet under license from another full-service truck-leasing enterprise such as Hertz or Avis without being expelled from the Association. The overall effect of the Association's rules is thus to severely limit over-the-road leasing competition between members of the Association, since, to engage in such competition, a lessor that does not have its own national service network or access to that of a national company such as Hertz or Avis needs reciprocal service.

General Leaseways decided to defy the location and nonaffiliation restrictions, and it brought this suit to prevent the Association from expelling it for its infractions. The preliminary injunction orders the Association not to expel it pending the trial on the merits. The Association's appeal requires us to consider the standards for granting preliminary injunctions and the outer bounds of permissible cooperation among competitors under section 1 of the Sherman Act, 15 U.S.C. § 1.

■ The cases in this circuit usually say that a district judge asked to issue a preliminary injunction must consider four things: the harm (1) to the plaintiff and (2) to the defendant from the denial or grant of the injunction, respectively, (3) the likelihood of the plaintiff's prevailing on the merits when the case is tried, and (4) the effect on the public of granting or denying the preliminary injunction. The latest such decision is *Libertarian Party v. Packard,* 741 F.2d 981 at 984–985 (7th Cir. Aug. 15, 1984). But the heart of the four-factor test is a comparison of the likelihood, and the gravity, of two types of error: erroneously granting a preliminary injunction, and erroneously denying it. *Omega Satellite Products Co. v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982). The likelihood of an error depends on the merits of the case as they appear from the preliminary-injunction hearing. If the plaintiff seems quite likely to win the case when it is tried, then the probability that granting the preliminary injunction will give him an undeserved benefit will seem small, and granting the injunction will be the decision that minimizes the likelihood of an error. If, moreover, the plaintiff will be hurt more by denial of the preliminary injunction than the defendant will be hurt by its grant, the gravity of the error in denying the preliminary injunction should it turn out later that the plaintiff was entitled to the injunction (there would of course be no error if it turned out he was *not* entitled) will clearly exceed that of erroneously granting it; and the dispari-

ty will be further magnified if the public as well as the plaintiff will be harmed by denying but not by granting the injunction. The hypothetical case we have just described is an easy one for granting a preliminary injunction. And it is this case.

■ Expulsion from the Association would force General Leaseways to cease doing business under the NationaLease name and, more important, would deny it the right to obtain prompt and efficient service from members of the Association. This would not wreck General Leaseways completely, because it has other franchises; and, in any event, if it wins the suit, it will be entitled to damages for the loss of business caused by its expulsion. But since its National franchises are a major part of General Leaseways' business, expulsion might be a grievous, though probably not a lethal, blow. Out of a total of 17 franchises under which General Leaseways does business, four are from National. We do not know what fraction of General Leaseways' business is done under them, but the difficulties of proving lost profits (on which see, e.g., *Taylor v. Meirick*, 712 F.2d 1112, 1119–22 (7th Cir.1983), and *Hayes v. Solomon*, 597 F.2d 958, 976–77 (5th Cir.1979)) make it chancy to rely on a damage award to provide full compensation even where as in this case a preliminary injunction is not necessary to keep the plaintiff afloat while the suit is proceeding toward final judgment.

The countervailing harm to the Association from being forced to clasp a viper to its breast during what may be the protracted period until final judgment is rendered must also be considered, see *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.*, 604 F.2d 755, 764 (2d Cir.1979), but probably it is less than the harm to General Leaseways from being expelled. The principal thing the Association complains about is being forced to share confidential information with a firm whose expansion threatens to destroy the present balance among the Association's members. But the Association assures us that the information that members exchange under its auspices is the kind normally exchanged among members of a trade association, and is not so sensitive that it could significantly impair competition between General Leaseways and the other members—if it were, the Association might stand condemned under other and clearer antitrust grounds than those advanced by General Leaseways. See *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16, 446 n. 22, 98 S.Ct. 2864, 2875 n. 16, 2878 n. 22, 57 L.Ed.2d 854 (1978); *Penne v. Greater Minneapolis Area Bd. of Realtors*, 604 F.2d 1143, 1148 (8th Cir.1979). It seems, then, that while the harm to General Leaseways if the preliminary injunction is denied is not of terminal gravity, the harm to the Association if the injunction is granted will, on the Association's own representations, be slight indeed.

■ Since the balance of harms strongly favors the grant of the preliminary injunction, it is not necessary for us to decide whether General Leaseways is certain or even highly likely to prevail at trial; it is enough that it has raised a substantial question on the merits. See, e.g., *American Hospital Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir.1980); *Charlie's Girls, Inc. v. Revlon, Inc.*, 483 F.2d 953, 954 (2d Cir.1973) (per curiam). Until a few years ago it would have been possible to opine confidently not only that General Leaseways had some chance of prevailing but that it had an overwhelming chance: that when firms in the same line of business agree not to enter each other's territories they violate section 1 of the Sherman Act even if they might be able to show that dividing markets had yielded economic benefits greater than any plausible estimate of the costs in diminished competition; that, in short, horizontal market divisions are illegal per se. See, e.g., *United States v. Topco Associates, Inc.*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 356–57, 87 S.Ct. 1847, 1852, 18 L.Ed.2d 1238 (1967); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951); *United*

*States v. Nationwide Trailer Rental System, Inc.*, 156 F.Supp. 800 (D.Kan.), aff'd without opinion, 355 U.S. 10, 78 S.Ct. 11, 2 L.Ed.2d 20 (1957).

In both *Sealy* and *Topco*, a group of small competitors had divided markets on geographic lines as an incident to the sharing of a trademark, and the group argued that its market share was too small to make cartelization a palpable danger to competition or a plausible explanation of what it was doing. Apparently each group was just trying to prevent members from taking a free ride on other members' efforts to promote the trademark. And yet in both cases the market division was held to be a per se violation of section 1. In *Sealy* (as in *Timken*) the division of markets was coupled with price fixing, against which antitrust law has long come down very hard—though, as we shall see, price fixing and division of markets have identical competitive effects. But *Topco* held that horizontal market division is illegal per se even if price fixing is not present. 405 U.S. 609 at n. 9, 92 S.Ct. 1134 at n. 9.

This case is even stronger for condemnation, because the free-rider argument made by National Truck Leasing Association is much weaker than the free-rider arguments in *Sealy* and *Topco*. A member of the Sealy group who promoted the Sealy trademark in his sales area by extensive (and expensive) advertising could not recoup his expenses by charging the people who saw his ads for the privilege of seeing them; virtually no one will pay to consume advertising. He could recoup only by selling his mattresses at a price that covered those expenses along with all his other costs. It is this form of recoupment that the free rider—in *Sealy*, a manufacturer of mattresses under the same trademark who has not borne the expense of promoting the mark—thwarts by invading the territory of the advertising manufacturer: by seeking, in other words, to reap where he has not sown. But members of National Truck Leasing Association charge each other for emergency repair service.

The Association argues that they do not charge the full price: that is, do not charge the premium—indeed, the extortionate—price they could get in an unregulated market for providing the prompt service to which members of the Association are entitled by its rules. When a truck breaks down, the owner is pretty much at the mercy of the nearest repair service. Unless he owns the service or has a contract with the owner or the sort of reciprocal-service arrangement that the Association has created for its members, he will not have access to a competitive market in repairs. (The salvage of ships in distress involves surprisingly similar problems, on which see Gilmore & Black, The Law of Admiralty 578–81 (2d ed. 1975).) Therefore, if one member of the Association—General Leaseways, say—grew so large relative to the others that it was consistently demanding more repairs on its trucks than it was performing on its fellow members' trucks, it would be exploiting the "underpricing" of repair service by the other members.

This argument is terribly speculative, though. As a member of the Association grows, he puts himself in a position to expect more service calls on himself (because he is serving a larger area) as well as to demand more service from others. Moreover, there is no evidence that the Association seeks to limit the growth of its members so that all remain about the same size. Also the Association does not limit repair prices, and it has not explained why its members do not (has not even shown they do not) charge fully remunerative prices for the repair services they provide each other. Even if they do refrain from gouging one another, such forbearance would be a burden or cost of repairing a fellow member's truck only if that repair job made it impossible to do another repair job that would fetch a higher price. The Association put in no evidence that this has ever happened.

It is not repairs that sellers find hard to charge for directly. It is *information*—in the form of advertising, showroom display, sales demonstrations, courteous and informed salesmen, and other presale services—that free riders in previous cases were

able to take advantage of because the information was being "given away" by a seller who could recover his cost only by selling the product to the consumer who used the information. Repairing is not informing. And National's franchisees do little advertising or other promotion of the NationaLease trademark. They are selling to businesses, not consumers, and advertising usually is less important in selling to businessmen than to consumers. But whatever the reason for the lack of promotional effort, the division of markets cannot (on this record) be justified as a measure for promoting the NationaLease mark.

Aware that this is an easy case for condemnation under *Sealy* and *Topco*, the Association urges in veiled but unmistakable terms that these decisions are no longer good law, having been superseded by *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), and *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). *Sylvania* held that manufacturers can limit the sales territories of their distributors and dealers when it is reasonable to do so in order to prevent free riding. The Association argues that it is a detail whether the territorial restriction is imposed by the manufacturer on his dealers or by a group of manufacturers on each other, provided the restriction is a reasonable measure to prevent free riding.

The free-rider problem in *Sylvania* arose because dealers who had spent money promoting Sylvania television sets risked being undercut by other dealers—dealers who had not made such expenditures, and who were thus exploiting the market created by the dealers who had. The free riders could undersell the other dealers because their costs of promotion naturally were lower. The same free-riding problem had called forth the territorial restrictions invalidated in *Sealy* and *Topco*. In all three cases there was plenty of interbrand competition, which is to say competition between sellers of the brand in question and sellers of other brands of the same product (mattresses, groceries, television sets), so the

fact that the trademark licenses eliminated intrabrand competition was not worrisome. If the restriction on intrabrand competition did not enable the trademark licensees to make their brand more attractive to consumers, consumers would switch to competing brands.

There is, then, notwithstanding the approving citation of *Topco* in *Sylvania*, see 433 U.S. at 58 n. 28, 97 S.Ct. at 2561 n. 28, and in such later cases as *National Collegiate Athletic Ass'n (NCAA) v. Board of Regents,* —— U.S. ——, 104 S.Ct. 2948, 2959 n. 18, 2960 nn. 19, 21, 82 L.Ed.2d 70 (1984); *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1283–84 (7th Cir.1983); *Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 830–31 (7th Cir. 1978), and *United States v. Koppers Co.*, 652 F.2d 290, 293–94, 296 (2d Cir.1981), a tension between *Sylvania* on the one hand and *Sealy* and *Topco* on the other. But since National Truck Leasing Association has not yet made a plausible free-rider argument, this is not the case—not at the preliminary-injunction stage, anyway—to try to resolve the tension.

*Broadcast Music* upheld the blanket licenses by which associations of composers sell musical performance rights to radio stations and other performance outlets. Since the blanket license gives the licensee, for a fixed fee, the right to play any composition in the association's library, it eliminates price competition among the composers belonging to the association. Nevertheless the Supreme Court held that the blanket license was not a per se violation of section 1 of the Sherman Act. National Truck Leasing Association argues in effect that after *Broadcast Music* no reasonable cartel agreement can be a per se violation of section 1. We hesitate to read the decision so broadly. Access to a repertoire of thousands of songs is not something the individual composer can give, so what the performing-rights associations are engaged in is not (or not just) the suppression of price competition among composers. It is the provision of a distinctive product—access to a vast musical repertoire. Each

association is the "producer," and is entitled to price its "product" as it wants as long as it does not collude with the other association. So viewed, *Broadcast Music* was not a cartel case.

There is nothing distinctive about the product involved in this case. Many firms offer full-service over-the-road commercial truck leasing; the Association merely makes it easier for small firms to offer it, by providing a reciprocal service arrangement that enables each member to provide his customers with emergency repair service anywhere in the nation. Unlike the composers' associations in the *Broadcast Music* case, this association sells nothing.

If this analysis is too formalistic—if *Broadcast Music* is more realistically described as a case where the Supreme Court, though aware that an exclusive sales agency normally is a method of cartelization (see, e.g., *United States v. American Smelting & Refining Co.*, 182 F.Supp. 834, 855 (S.D.N.Y.1960); Stigler, The Organization of Industry 41 (1968)), upheld exclusive sales agencies of composers because of the enormous efficiency of selling musical performing rights jointly (see *NCAA v. Board of Regents, supra,* 104 S.Ct. at 2961, where *Broadcast Music* is so described)—National Truck Leasing Association still loses. ASCAP and BMI could not provide ready access to their entire repertoires if each radio station had to negotiate separately with each composer over the price of each song. But National's members could— were it not for the territorial restrictions— compete in each other's territories while continuing to provide each other emergency repair services of a specified quality at a specified price. Of course this would make the members each other's competitors in leasing and customers in repairs. But firms often have both a competitive and a supply relationship with one another. A manufacturer of aluminum might both sell aluminum to fabricators and do its own fabrication in competition with its customers. Airlines compete but also feed passengers to each other. Railroads compete but also join in offering through routes and joint rates. Oil companies compete in some

markets and are joint venturers in others. It does not follow that because two firms sometimes have a cooperative relationship there are no competitive gains from forbidding them to cooperate in ways that yield no economies but simply limit competition. Compare 49 U.S.C. § 10706 (antitrust exemption of common carrier rate agreements); Newspaper Preservation Act, 15 U.S.C. §§ 1801–1804; *Committee for an Independent P–I v. Hearst Corp.*, 704 F.2d 467, 481–82 (9th Cir.1983); 4 Areeda & Turner, Antitrust Law ¶ 947, at p. 170 (1980).

After argument in this case, the Supreme Court decided the *NCAA* case, *supra,* and again refused to hold that an agreement between competitors not to compete was illegal per se under the Sherman Act. The agreement was among the college football teams that belong to the NCAA, and limited the number of football games that each team could license for television broadcast. The Supreme Court described this agreement as one to limit output. 104 S.Ct. at 2960. That is the equivalent of a division of markets. A firm that is free from effective competition will reduce its output below the competitive level (whether directly or, as we shall see in a moment, indirectly by raising price). Consumers will pay more when supply is scarcer, yet it will cost the firm less to produce a smaller supply—so the firm's profits will be greater at the reduced output. One way the firm can free itself from competition is by agreeing with sellers of the same product that they will not enter each other's markets; such an agreement will create a series of regional or local (sometimes, as in *Timken,* national) monopolies. An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand to the reduced supply. Thus, with exceptions not relevant here, raising price, reducing out-

put, and dividing markets have the same anticompetitive effects.

The Court held nevertheless that the NCAA's agreement to limit output had to be tested under the Rule of Reason, because organized athletic competition is "an industry in which horizontal restraints on competition are essential if the product is to be available at all." *Id.* at 2961. The essence of successful league competition is maintaining a balance of power among the competitors—a goal antithetic to the goals of competition in a conventional economic market. *NCAA* may seem to go a step beyond *Broadcast Music* toward a regime in which only unreasonable horizontal restraints are illegal, because the Court in *NCAA* did not condition the applicability of the Rule of Reason on proof that the particular restriction that had been challenged was necessary if the product was to be brought to market at all. There was, however, a plausible connection between the specific restriction and the essential character of the product. Since the balance of power among the teams in the NCAA might be disturbed by disparities in team wealth, limiting the ability of the more popular teams to cash in on their popularity through unrestricted televising of their games might have promoted the NCAA's essential lawful objectives. It was arguable, in other words, that the television output restriction was "ancillary" to a lawful main purpose. See *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281–82 (6th Cir.1898), aff'd as modified, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265–66 (7th Cir.1981); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 726 F.2d 1381, 1395–96 (9th Cir.1984); Bork, The Antitrust Paradox 29–30 (1978). But in this case the organic connection between the restraint and the cooperative needs of the enterprise that would allow us to call the restraint a merely ancillary one is missing. Although some degree of cooperation among members of National Truck Leasing Association in providing reciprocal services may well promote competition in the truck-leasing industry,

no reason has been suggested why that cooperation requires that members be forbidden to compete with each other in leasing trucks.

The per se rule would collapse if every claim of economies from restricting competition, however implausible, could be used to move a horizontal agreement not to compete from the per se to the Rule of Reason category. We are told, therefore, to apply the per se rule when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., supra*, 442 U.S. at 19–20, 99 S.Ct. at 1562, quoted in *National Collegiate Athletic Ass'n v. Board of Regents, supra*, 104 S.Ct. at 2960. In other words, if the elimination of competition is apparent on a quick look, without undertaking the kind of searching inquiry that would make the case a Rule of Reason case in fact if not in name, the practice is illegal per se.

■ Taking a quick look here, we conclude, on the basis of the record compiled in the preliminary-injunction hearing, that the division of markets among National Truck Leasing Association's members is a per se violation of section 1 of the Sherman Act. It is a horizontal market division that does not appear to be ancillary to the reciprocal provision of service or any other lawful activity. Our conclusion is reinforced, though only slightly, by some of the documents in the record. For example, one National franchisee writes another: "We have all the competition we need from the outside without having to compete with our 'brothers'." And a consultant states with reference to the question of multiple franchises in large metropolitan areas: "Generally, adding an additional franchise to a metropolitan market has minimal benefits to the system as a whole (additional dues), and individual members (an additional service location). However, it has potentially significant competitive disadvantages to existing members in the multifranchise market." We attach rather little weight to internal company documents used to show

anticompetitive intent, because, though they sometimes dazzle a jury, they cast only a dim light on what ought to be the central question in an antitrust case: actual or probable anticompetitive effect. But here they corroborate an inference of anticompetitive effect based on the objective evidence of what the defendant had done.

As it is possible that we are wrong in holding that this case is governed by the per se rule, we shall follow the prudent example of the court of appeals in the *NCAA* case (see *Board of Regents v. National Collegiate Athletic Ass'n*, 707 F.2d 1147, 1157 (10th Cir.1983), aff'd, —— U.S. ——, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)) and decide also whether, if the case were governed by the Rule of Reason, we would still have to uphold the preliminary injunction on the present record.

■ With the Rule of Reason becoming a more popular rule of decision in the wake of *Sylvania*, some progress has been made toward giving it some structure by requiring that the plaintiff first prove that the defendant has sufficient market power to restrain competition substantially. See, e.g., *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 702 (7th Cir. 1984); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 745 (7th Cir.1982); *Graphic Products Distributors, Inc. v. Itek Corp.*, 717 F.2d 1560, 1568 (11th Cir.1983); *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 298 (5th Cir. 1981); cf. *Lektro-Vend Corp. v. Vendo Co., supra*, 660 F.2d at 268; Easterbrook, *Vertical Arrangements and the Rule of Reason*, 53 Antitrust L.J. 135, 157–68 (1984). If not, the inquiry is at an end; the practice is lawful. But if it seems that the defendant does have the power to restrain trade substantially, then inquiry proceeds to the question whether the challenged practice was likely—with due consideration for any justificatory evidence presented by the defendant—to help rather than hurt competition, viewed not as rivalry as such but as the allocation of resources that maximizes consumer welfare.

The markets for commercial truck leasing are, as we have said, local because of customer preference; and General Leaseways presented evidence that within these local markets, profits are higher the fewer the leasing firms. This suggests an absence (more precisely, a weakness) of competition. In a fully competitive market, price is equal to cost (appropriately measured) regardless of the number of firms; in a noncompetitive market, price rises as the number of firms falls, because collusion is easier with fewer firms. To counter this evidence the Association offered evidence of no great probative force, see *United States v. Philadelphia National Bank*, 374 U.S. 321, 366–67, 83 S.Ct. 1715, 1743–1744, 10 L.Ed.2d 915 (1963), that the members of the industry consider themselves to be in intense rivalry, and more impressive evidence that truck-leasing companies compete with one another, with motor common carriers, and even with their own customers, who can always buy their own trucks. However, national truck-leasing companies such as Hertz, Avis, and Ryder are not (so far as the record shows) present in every market. And since motor common carriers remain heavily regulated by the federal government (see 49 U.S.C. §§ 10701, 10702, and especially 10704(a)(1)), there is no assurance that the rates these carriers charge are competitive rates; if they are supracompetitive, they create an umbrella beneath which colluding sellers of a substitute product can charge supracompetitive prices too. And while some customers of commercial truck-leasing firms might buy their own trucks if truck-leasing rates rose significantly above the competitive level, others would not have sufficient trucking needs to justify buying their own trucks unless lease rates became astronomical; and even the customers in the first group would have to worry about getting emergency repair service at reasonable cost.

It is not a good enough answer to all this that new firms can easily enter the over-the-road truck-leasing business if rates rise above the competitive level. Since effective competition requires that each lessor be able to guarantee nationwide repair ser-

vice for his trucks, either the new entrant must enter on a national scale, which would take time, or he must enter as a member of a league of small firms, such as the Association, which may take some time to arrange, too. This also answers the Association's argument that its members are free under its rules to enter each other's markets so long as they do not do so as franchisees either of national firms or of the Association. This means they can enter provided they do not enter on an efficient basis, which would require that they be leagued with other firms in a nationwide service network.

■ No doubt the Association, with all the competition it does face, is not a powerful cartel. And yet on this record we cannot say that the district judge clearly erred in finding that the restrictions that General Leaseways defied have a substantial anticompetitive potential. This finding is dispositive under the Rule of Reason because the Association's attempted justification based on free-rider problems is unpersuasive. Cf. *North American Soccer League v. National Football League*, 670 F.2d 1249, 1257–61 (2d Cir.1982).

■ If, however, it is quite possible that the Association is attempting to cartelize the local markets its members do business in, what equity has General Leaseways in seeking even temporary protection from being expelled? If cartel members have a falling out, it might seem contrary to the spirit of antitrust law for a court to lend its aid to one side of the dispute or the other. The question we must ask, however, is not whether General Leaseways makes an appealing plaintiff but whether granting it a preliminary injunction (to be made permanent, presumably, if it prevails in the trial on the merits) would advance or retard the objectives of the antitrust laws. For ever since the Supreme Court, in *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968), rejected the defense of *in pari delicto* in antitrust cases, it has been clear that whenever some maxim of equity (such as that to get equitable relief you must have "clean hands") collides with the objectives of the antitrust laws, the equity maxim must give way.

Preserving General Leaseways as a member in good standing of the Association would advance those objectives. If the Association is a cartel, still General Leaseways appears determined to disrupt it. And if General Leaseways has no remedy against being expelled by the Association, the Association will be able with relative impunity (relative because there is always the possibility of governmental antitrust action) to use expulsion as a sanction against any member who refuses to abide by its anticompetitive restrictions. By depriving the Association of this sanction, the injunction encourages members to ignore those restrictions. There would be a problem if the injunction gave General Leaseways access to enough information about the other members' prices or costs to facilitate price fixing, but both parties assure us that the information exchanges made through the Association are lawful trade association activities (although one of the documents in the record refers to exchanging "intimate proprietary" information), and we are told that the Justice Department is monitoring this litigation. There would also be a problem—a very serious one—if General Leaseways were seeking damages measured by the loss of cartel profits that it might obtain as a member in good standing of the Association. See *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 569–70 (5th Cir.1978); *Murphy Tugboat Co. v. Crowley*, 454 F.Supp. 847, 856 (N.D.Cal.1978). But no issue of damages is before us.

Although we uphold the preliminary injunction, we do not mean to prejudge the outcome of the trial on the merits. Our conclusions are based on the incomplete record made in the preliminary-injunction proceeding. The full trial may cast the facts in a different light.

AFFIRMED.