**SEALY MATTRESS COMPANY OF MICHIGAN, INC., Plaintiff,**

v.

**SEALY, INC., Defendant.**

**No. 84 C 4338.**

United States District Court, N.D. Illinois, E.D.

Dec. 31, 1984.

Edward L. Foote, James L. Perkins, Mary A. Martin, Winston & Strawn, Chicago, Ill., for plaintiff.

Stephen C. Shamberg, Howard R. Koven, Russ M. Strobel, Friedman & Koven, Max E. Wildman, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

This matter is before the Court on the motion of plaintiff Sealy Mattress Company of Michigan, Inc. ("Michigan") for entry of a preliminary injunction restraining the defendant Sealy, Inc. ("Sealy") from asserting directly or through its wholly-owned Canadian subsidiary, Sealy Canada, Ltd. ("Sealy Canada"), Canadian trademark rights so as to prevent Michigan from exporting its products from the United States

to Canada. Michigan contends: (1) that the conduct of Sealy and its subsidiary violates a judgment of this Court prohibiting Sealy, and its subsidiaries from restricting Michigan "in any substantial way to sales of Sealy products within a prescribed territory;" and (2) that Sealy's conduct violates the terms of a license agreement. Sealy denies that the terms of the judgment apply to the activities of its Canadian subsidiary; denies that it has violated any contractual rights of Michigan and asserts that this Court, for reasons of comity, should not enter any order which would prevent or hinder trademark infringement and registration proceedings in Canada.

The matter was referred to a magistrate to hear evidence and make a report and recommendations. The magistrate has filed a report and recommendations together with the record of the proceedings. The magistrate recommended that Michigan's request for injunctive relief be denied. Neither party requested a *de novo* evidentiary hearing before the Court. For the most part, the facts are undisputed. However, the parties differ sharply over the correct legal conclusions to be drawn from the evidence.

Having examined the record and the magistrate's report, the Court concludes that the magistrate's recommendation (although not all of her findings) must be rejected and that a preliminary injunction should issue. The plaintiff has made a substantial showing of a likelihood of success on the merits of its charge that defendant and its subsidiary are misusing trademark rights to accomplish a territorial restriction contrary to this Court's injunction. The plaintiff has demonstrated that the harm to it by refusing an injunction outweighs any harm to the defendant of granting an injunction. Further the public interest will be served by the strict enforcement of a prior judgment of this Court intended to prohibit any territorial restriction that prevents intrabrand competition in Sealy products.

### FINDINGS OF FACT

Based on the evidence presented the Court finds the facts to be as follows:

1. Defendant Sealy is a Delaware corporation engaged in the business of licensing others to manufacture and sell bedding products, including mattresses and foundation units, under the Sealy name and trademarks.

2. Plaintiff Michigan has been a contractual licensee and a substantial shareholder of Sealy since about 1940, manufacturing Sealy bedding products in the Detroit, Michigan area.

3. Michigan has filed a motion for preliminary injunction against Sealy seeking to enjoin Sealy Canada from proceeding with a previously filed Canadian suit, or from otherwise asserting its rights under Canadian law, and to compel Sealy to provide Michigan with Canadian manufacturing specifications. Sealy opposed the motion and an evidentiary hearing was held on July 11–13, 1984.

4. Michigan's complaint against Sealy alleges: (1) breach of the Sealy, Inc. Uniform U.S. License Contract As Amended Effective July 3, 1975; (2) breach of a Supplemental Final Judgment entered by this Court in *United States v. Sealy*, No. 60 C 844; (3) tortious interference with Michigan's actual and prospective business relationships; and (4) conspiracy and attempt to monopolize in violation of the Sherman Antitrust Act. Sealy has answered the Complaint by denying its principal allegations and raising various defenses.

### THE 1967 JUDGMENT

5. In 1960, the United States filed a civil antitrust suit against Sealy alleging, among other things, that Sealy's system of exclusive sales territories violated Section 1 of the Sherman Act. On June 12, 1967, the United States Supreme Court in *United States v. Sealy*, 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), held that Sealy's system of exclusive sales territories violated Section 1 of the Sherman Act. The Supreme Court stated that "Sealy, Inc. is an instrumentality of the licensees for purposes of horizontal territorial allocation," 388 U.S. at 354, 87 S.Ct. at 1851, and that "Sealy was a joint venture, of, by and for its stockholder licensees; and the stock-

holder licensees are directly, without even the semblance of insulation, in charge of Sealy's operations." 388 U.S. at 353, 87 S.Ct. at 1850.

6. The Supreme Court also rejected Sealy's contention that its exclusive sales territories were part of a lawful trademark licensing scheme stating, "A trademark cannot be legally used as a device for Sherman Act violation." 388 U.S. at 356 n. 3, 87 S.Ct. at 1852 n. 3, quoting *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 599, 71 S.Ct. 971, 975, 95 L.Ed. 1199 (1951).

7. On remand, this Court entered a Supplemental Final Judgment (the "judgment") on December 27, 1967. *United States v. Sealy,* CCH 1967 Trade Cases ¶ 72,327 (N.D.Ill.1967). That judgment expressly binds Sealy, all of Sealy's subsidiaries and each of its licensees, who must consent to its terms as a condition of any franchise or license to manufacture or sell products in the United States under any Sealy trademark or tradename. The principal provision of the judgment prohibits any form of territorial restriction upon the sales of Sealy products by Sealy, its subsidiaries and any licensee:

> Defendant and consenting manufacturers are each enjoined and restrained from maintaining, adhering to, enforcing or claiming any rights under any combination, contract, agreement, understanding, plan or program between or among themselves or any other manufacturer of Sealy products, to limit or restrict any manufacturer in any substantial way to sales of Sealy products within a prescribed territory.

### Litigation Concerning the 1968 License Agreement

8. After entry of the judgment, Sealy prepared a new license agreement (the "1968 license agreement") for its licensees, including Michigan. There have been certain amendments to the 1968 license agreement. That agreement, however, as last amended July 3, 1975, remains in effect. The 1968 license agreement provides that it was made "pursuant to the requirements of the ... [judgment]," and incorporates

the judgment by reference. The licensing provision of the 1968 license agreement grants the licensee the right to manufacture Sealy products at its plant and "... to sell Sealy products and to use Sealy Marks in connection therewith." Nothing in the 1968 licensee agreement prohibits the licensee from selling Sealy products in Canada or in any other geographic area.

9. The 1968 license agreement contained a number of new provisions. The agreement redefined the licensees' former exclusive sales territories as their "areas of primary responsibility" or "APR's." The agreement provided that licensees must obtain Sealy's approval to establish a plant outside their APR's, or to add or relocate a plant inside their APR's. The agreement required licensees making sales of Sealy bedding products outside their APR's to make substantial payments, called "pass-over payments" and "warranty repair charges" to the licensees whose territories had been "invaded." Finally, the agreement granted Sealy a "right of first refusal" in the event that any licensee decided to sell its business to a third party.

10. Ohio-Sealy Mattress Mfg. Co. ("Ohio-Sealy"), a Sealy licensee, filed suit in this Court alleging that Sealy used a combination of the new license agreement provisions to continue unlawful market allocation in violation of Section 1 of the Sherman Act. As a result of this litigation Ohio-Sealy obtained a damage award of over $10 million as well as an equitable decree prohibiting and restricting the enforcement of certain license provisions relating to plant location, warranty repair charges and pass-over payments. The Seventh Circuit has upheld both of these judgments. *See Ohio-Sealy Mattress Mfg. Co. v. Sealy,* 585 F.2d 821 (7th Cir.1978) (damages); *Ohio-Sealy Mattress Mfg. Co. v. Sealy,* 669 F.2d 490 (7th Cir.1982) (equitable relief); and *Ohio-Sealy Mattress Mfg. Co. v. Kaplan,* 745 F.2d 441 (7th Cir.1984) (remanded for post-verdict damages). The facts concerning Sealy's unlawful creation and use of license agreement provisions to prevent intrabrand competition are matters

of public record as set forth in the cited reported opinions.

11. Prior to 1968, Sealy itself owned no bedding manufacturing plants. Since 1968, however, Sealy has acquired 11 of its formerly independent licensees located in the United States.

12. In 1979, Ohio-Sealy filed an action against Sealy, alleging that Sealy had engaged in an unlawful allocation of territories to restrain competition by exercising its right of first refusal so as to prevent Ohio-Sealy from acquiring the Portland, Oregon Sealy licensee. That action is pending before this Court. In denying a temporary injunction but granting a hold-separate order in Ohio-Sealy's favor, this Court observed:

> Sealy objects to the magistrate's frequent reference to this history of conduct in reaching his conclusion that Ohio is likely to prevail on the merits of the Section 1 claim. It contends that the right of first refusal in this case, exercised by a 'blue-ribbon' board of directors that is independent from the licensees, is clearly distinguishable from the prior exercises of that right as recounted in *Ohio-Sealy*. The Court agrees that Sealy should not be irrebuttably condemned in this case on account of its past behavior. Yet, neither can Sealy expect this Court—or a jury—to view the instant case in a vacuum. This is neither necessary nor desirable. There are a number of factual issues in this case concerning the intent of Sealy which cannot be fairly viewed without reference to the history of Sealy in general, and its relationship with Ohio in particular.

*Ohio-Sealy Mattress Mfg. Co. v. Duncan*, 486 F.Supp. 1047, 1059 (N.D.Ill.1980).

13. The nature and results of continuing litigation with respect to the terms and effect of the 1968 license agreement are relevant to a consideration of Michigan's charge that Sealy is again attempting to use trademarks to restrict Michigan to a specific territory thereby preventing intrabrand competition contrary to the intent and terms of this Court's judgment.

14. Under the 1968 license agreement, as amended effective July 3, 1975, Michigan produces and sells Sealy products. It is not disputed that Michigan's products are produced in strict compliance with quantity specifications issued from time to time by Sealy. Sealy receives royalties on all sales of Sealy products made by Michigan. In 1983, Michigan paid Sealy about $350,000 in royalties. Michigan estimates that it will pay a greater sum in 1984.

## Michigan's Exports and Canadian Activity

15. Michigan has periodically investigated the possibility of making export sales of Sealy bedding products to customers located in Canada. Prior to 1983, however, such sales were not economically feasible, because of the relative prices of Sealy bedding products in the United States and Canada and the substantial Canadian import tariff on bedding. In 1983, Michigan found that changes in the relative prices of Sealy bedding products in the United States and Canada and a continuing reduction in the applicable Canadian tariff had made it economically possible to compete in Canada. At that time, Sealy's Toronto licensee priced its products approximately 51% higher than Michigan.

16. Michigan began selling to Canadian customers in competition with Sealy's Toronto licensee during October, 1983. By March of 1984, Michigan had sold Sealy bedding products to ten Canadian customers. Some of these customers had not previously bought Sealy products from any source. For the period from October, 1983 through June, 1984, Michigan's sales to these customers totalled approximately $900,000.. All of these sales were f.o.b. Detroit, with title passing in Michigan. During this period, Michigan's Canadian sales ran between 16 and 20% of its total sales.

17. Michigan has expended sums for cooperative advertising programs with Canadian retailers, and has spent time and effort in developing and servicing these accounts. From 1980–1984 Sealy Canada spent a total of $1.8 million on national

advertising in the Canadian media and $1.2 million on cooperative advertising.

18. Michigan and the other Sealy licensees located in the United States, by advertising in American media, both individually and through Sealy, have contributed to the sale of Sealy bedding products in Canada. Advertising in American media, and in particular American television, has been an important means of establishing consumer recognition and acceptance in Canada. The vast majority of Canadians are exposed to the American media, including television, radio and newspaper. Michigan has spent substantial sums (nearly $500,000 in 1983 alone) on its own advertising of the Sealy name in Detroit through television, radio and newspapers, all of which are received in Canada. Individual expenditures by Michigan for media advertising have thus equalled those made by Sealy's subsidiary for such advertising throughout all of Canada. Other Sealy licensees located in parts of the United States near the Canadian border conduct similar programs.

19. Sealy itself spends $4 million per year on advertising in American national media. National advertising expenditures are paid for by the royalties of the Sealy licensees, including Sealy Michigan. These expenditures are for the benefit of all Sealy licensees, not for the exclusive benefit of any Sealy subsidiary.

20. In selling to Canadian customers, Michigan did not offer prices lower than its prices in the United States. Michigan's sales to Canadian customers have been profitable. When Michigan entered the Canadian market, however, its prices, even allowing for Canadian tariffs, were below those being offered for Sealy bedding products made in Canada. Michigan's Canadian customers passed these lower prices on to consumers, and advertised substantially reduced retail prices. In some cases, Michigan's entry into the Canadian market resulted in wholesale and retail price reductions of 50% or more.

21. In response to Michigan's sales in Canada, Sealy Canada and its prior Toronto licensee reduced their prices for Sealy bedding products to levels comparable to those offered by Michigan in areas where Michigan makes sales. Sealy Canada did not make these same price reductions, however, in parts of Canada where Michigan does not make sales. Despite reduced prices, total dollar sales of Sealy Posturepedic bedding products by Sealy Canada's Toronto plant during the period from January through May, 1984, are up 63% over the same period last year, and sales for May, 1984, were up 162% over May, 1983. Total sales of Sealy bedding products in Eastern Canada have also increased by the additional amount of Michigan's sales. Cooperative advertising of Sealy bedding products with Canadian retailers has increased since Michigan began making Candian sales. Until Michigan entered Canada Sealy Canada did not advertise that its mattresses were "made in Canada."

### Sealy Canada, Ltd.

22. Sealy Canada is a wholly-owned Canadian corporation which manufactures and sells bedding products in Canada under Sealy Canadian marks. From 1954 until 1982 Sealy Canada and its predecessor licensed others to manufacture and sell bedding products in Canada, but did not itself manufacture or sell. Until 1982, Sealy Canada had only one employee and no physical assets.

23. In 1954, Sealy sold to Sealy Sleep Products, Inc., the predecessor of Sealy Canada, some of the trademarks which are the subject of Canadian litigation. At that time Sealy owned 52% of Sealy Sleep Products, Ltd. In October 1980, Sealy purchased all the licensee-held stock of its Canadian subsidiaries and since that time has owned 100% of Sealy Canada. It appears from exhibits in evidence that the trademarks sold to its subsidiary in 1954 were the same as those used in the United States and are identified on the registration statements as "first used in the United States."

24. In 1982, Sealy Canada purchased the manufacturing plant, equipment and operations of its Western Canadian licensee. In January, 1984, a date subsequent to plaintiff's entry into the Canadian mar-

ket, Sealy Canada purchased the manufacturing plant, equipment and operations of its Eastern Canadian licensee. Sealy Canada now has 125 employees on its payroll, including about 20 persons on its sales force. It has a warehouse in Montreal and manufacturing plants in Toronto, Winnipeg and Edmonton. Sealy Canada now has no licensees and all Sealy products are manufactured, distributed and sold by Sealy Canada.

25. Michael Kaplan, vice-president of finance and treasurer of Sealy, serves as president of Sealy Canada. He spends 10% of his time on Sealy Canada's business and the balance on Sealy matters. His office is in Chicago at Sealy headquarters. Three other officers of Sealy Canada, its executive vice-president, vice-president of operations who is also treasurer, and the assistant-secretary also have their offices at Sealy headquarters. Sealy issues the paychecks of the officers of Sealy Canada. Sealy Canada pays Sealy a management fee.

26. Sealy Canada has a two person board of directors. At his deposition, Kaplan did not know who the board members were and incorrectly believed that he was not a board member. Kaplan and a Canadian employee are the board members. At the hearing, Kaplan stated that the last Board meeting was held in 1982, although there was a telephone meeting held in December 1983 or January 1984.

27. Total sales in Canada by Sealy Canada for the period 1980–1984 were one hundred million dollars. Sealy products constituted 95% of total sales. Kaplan testified that wholesale prices for Sealy mattresses are set by Sealy Canada and retail prices by retailers. In the late summer or fall of 1983 he became aware of retailer complaints that competition in retail sales of Sealy mattresses had become difficult because some Canadian retailers were able to purchase Sealy mattresses at prices below those of Sealy Canada. Canadian manufacturing costs can be higher because some components have to be imported from the United States. He further testified that sales to retailer customers in Canada at lower prices adversely affected Sealy Cana-

da's profit margin and Sealy Canada was concerned that its market share was being eroded.

28. Beginning in 1983, Sealy Canada has filed 24 applications in Canada to register various Sealy names and logos. Michigan has filed oppositions to the registrations which have been published for comment.

29. In late February or early March, 1984, Sealy Canada filed a lawsuit in Canada against N. Tepperman, Ltd. ("Tepperman's"), one of Michigan's principal Canadian customers. This action, which alleges violations of Canadian trademark rights, seeks to prohibit Tepperman's from making further purchases of Sealy products from Michigan. The trademarks allegedly violated are some of the same marks used by Sealy and its licensees in the United States.

30. Kaplan testified he spoke with the president of Sealy before authorizing trademark infringement action in Canada. The magistrate found (and the Court agrees) that Kaplan's testimony that this was an independent decision by him for Sealy Canada is not credible.

31. On March 7, 1984, Sealy Canada sent letters to each of Michigan's Canadian customers. These letters advise that a lawsuit has been filed against Tepperman's, demand assurances that the customer will make no further purchases of Sealy products from Michigan, demand that the customer pay damages to compensate Sealy Canada for the "breach of its rights" and threaten quick legal action if those demands are not promptly satisfied. Sealy Canada's attorneys sent additional letters to those of Michigan's customers who did not comply with the demands stated in Sealy's March 7th letter.

32. Sealy Canada's ongoing conduct has injured Michigan's sales to its Canadian customers, and has damaged Michigan's relations with its Canadian retailers. All but two of those customers have stopped purchasing Sealy bedding products from Michigan. In order to keep even these two customers, Michigan has agreed to indemnify and hold them harmless against all

costs, including attorneys fees, which might arise out of legal actions by Sealy Canada. Some of Michigan's former customers, as a result of Sealy Canada's threats have stopped purchasing Sealy bedding products entirely.

33. Sealy Canada's threats and actions have prevented Michigan from obtaining additional Canadian customers. In its early months, Michigan's Canadian business expanded rapidly. Soon, however, it became impossible for Michigan to obtain new Canadian customers. Michigan contacted many Canadian retailers who told Michigan that they would make purchases from Michigan only after the Canadian trademark issues with Sealy Canada were resolved. These retailers gave Michigan no other reason for declining to make purchases from Michigan. It is difficult to determine with any degree of accuracy the number of additional Canadian customers which Michigan would have been able to obtain but for Sealy Canada's actions. Nor can it be determined with any degree of accuracy the amount of additional sales and profits, from both new and existing customers, lost by Michigan as a result of Sealy's actions. Michigan's Canadian business grew quickly and spanned a large area of Canada. Michigan's plant has substantial excess capacity.

### CONCLUSIONS OF LAW

The magistrate stated that she made no determination or recommendation on the parties' contrary interpretation of the judgment. The Court believes that this statement may explain her recommendation against injunctive relief. However, an interpretation of the judgment is required to resolve some of the disputed questions in this case.

The judgment recites that on appeal by plaintiff "the Supreme Court of the United States reversed the judgment of this Court, with respect to the territorial allocation charge, and remanded the case for entry of an appropriate decree in accordance with its opinion." Consequently, although the parties and the magistrate sometimes refer to the judgment as a "consent judgment," it is not such; at least not in a reductionist

sense that consent judgments or decrees are sometimes narrowly read and interpreted as contractual documents. *See, e.g., Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir.1984); *Alliance to End Repression v. Chicago*, 742 F.2d 1007, 1013 (7th Cir.1984) (role of public interests in interpreting consent decree).

The Court concludes with respect to the judgment: (1) that by its terms it applies to the defendant Sealy, "its officers, agents, servants, employees, subsidiaries, successors and assigns, and to those persons in active concert or participation with any of them who receive actual notice" of the judgment; (2) that it prohibits "any plan or program" "to limit any manufacturer in any substantial way to sales of Sealy products within a prescribed territory;" (3) that this Court has retained jurisdiction to enforce the injunction on the application of any consenting manufacturer; and (4) that the judgment should be liberally construed to carry out the remedial intent of prohibiting any territorial restriction that restrains intrabrand competition.

Based on the construction of the judgment as stated, it is not necessary to determine at this time whether or not the conduct shown in this case separately amounts to a contract, combination or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act. The issue before the Court is rather whether defendant, by and through its wholly-owned subsidiary, is using or asserting trademark rights to maintain territorial restrictions contrary to this Court's injunction. Accordingly, it is also not necessary at this stage of the proceedings to decide whether changes in Sealy's board, its program of vertical integration, or its acquisition policy have or have not changed its status as "an instrumentality of the licensees for purposes of the horizontal territorial allocation." *United States v. Sealy, Inc.*, 388 U.S. at 354, 87 S.Ct. at 1851. However, Sealy's conduct with respect to its licensees as delineated in prior court proceedings is a factor which may be considered in analyzing its conduct and intent in this case.

Sealy and Sealy Canada's conduct is sufficiently clear to warrant the conclusion, at this stage of the proceedings, that its efforts to enforce its trademark rights in Canada arose out of its desire to escape competition from Michigan. Moreover, the effect of such action if successful restricts Michigan to a territory outside of Canada contrary to this Court's injunction.

The evidence establishes that Sealy Canada attempted to stop Michigan from selling in Canada for the sole purpose of eliminating intrabrand competition and stabilizing or maintaining higher prices. Kaplan, the president of Sealy Canada, admitted that the only complaints he has ever received from retailers regarding Michigan's Canadian sales are that its prices are too low. He also admitted his concern that Sealy Canada would lose its market share if the low prices continue, despite the actual increase in sales that had occurred since Michigan entered the Canadian market and prices were reduced. After Sealy Canada acquired its Canadian licensees, it sued one of Michigan's largest customers for infringement, threatened similar suits against all of Michigan's other Canadian customers, and sought to enforce and expand its Canadian trademark rights.

Prior to Sealy Canada's actions, Michigan enjoyed Canadian sales at an annualized rate at well in excess of $1 million and was gaining new customers. Despite Sealy Canada's price reductions in the Eastern portion of Canada, Michigan continued to maintain its sales volume. However, after Sealy Canada's strenuous assertion of its Canadian trademarks, all but two of Michigan's customers stopped purchasing from Michigan. Several former and potential Michigan customers cited concern over trademark litigation as the reason for their refusal to deal with Michigan. The evidence of anticompetitive purpose and effect is clear.

█ The magistrate's recommendation that preliminary injunctive relief be denied rests in part on her conclusion that Sealy and Sealy Canada are separate entities. However, even if this Court were to accept that conclusion as correct, Sealy Canada, as a "subsidiary" of Sealy, is bound by the terms of this Court's injunction. Moreover, there is substantial evidence in the record to show that Sealy Canada is wholly controlled by and operated for the benefit of its parent Sealy, without any real semblance of independence between the two entities.

The Supreme Court held in *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), that for purposes of Section 1 of the Sherman Act there is no distinction between a parent and a wholly-owned subsidiary, but that it is in reality no different than a corporate division.

.... the coordinated activity of a parent and its wholly-owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly-owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder .... [I]n reality a parent and a wholly-owned subsidiary *always* [emphasis in original] have a 'unity of purpose or a common design.' They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; *the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests* [emphasis added].

104 S.Ct. at 2742. The *Copperweld* holding reenforces the Court's conclusion that on the evidence in the record all of the acts of Sealy Canada are attributable to Sealy.

Sealy attaches particular importance to the separate ownership of Canadian trademarks, the validity of those marks and its rights to proceed in the Canadian court. But this injunction proceeding is not concerned with the validity of those trade-

marks or whether they were or were not included in earlier license agreements. The question is whether Sealy is using foreign trademarks in a manner contrary to this Court's prior injunction against territorial restraints.

■ Horizontal territorial restraints are never justified solely as being ancillary to a trademark licensing system. *Sealy,* 388 U.S. at 356, n. 3, 87 S.Ct. at 1852, n. 3; *Timken,* 341 U.S. at 599, 71 S.Ct. at 975.

If a trademark may be the legal basis for allocating world markets, fixing of prices, and restricting competition, the unfailing device has been found to destroy every vestige of inhibition set up by the Sherman Act.

*United States v. Timken Roller Bearing Co.,* 83 F.Supp. 284, 316 (N.D.Ohio 1949), *affirmed,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951). *See also General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588, 589 (7th Cir.1984) (that Association members "share a trademark owned by the Association" did not justify territorial restraint).

■ Many courts including the Seventh Circuit Court of Appeals have recognized that anticompetitive conduct is not justified because it is incident or ancillary to a valid trademark licensing system. *See General Leaseways, supra; Evans v. S.S. Kresge Company,* 544 F.2d 1184, 1191 n. 24 (3d Cir.1976), *cert. denied,* 443 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977) (trademark license may not be used to avoid Sherman Act liability); *Fontana Aviation, Inc. v. Beech Aircraft Corporation,* 432 F.2d 1080, 1084 (7th Cir.1970), *cert. denied,* 401 U.S. 923, 91 S.Ct. 872, 27 L.Ed.2d 923 (1971) (restraints of trade cannot be justified as reasonable steps taken to implement a valid trademark licensing system); *Switzer Brothers, Inc. v. Locklin,* 297 F.2d 39, 46 (7th Cir.1961), *cert. denied,* 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9 (1962) (quality control provisions of the Lanham Act relating to trademark licenses cannot condone a violation of the antitrust laws); *Jack Winter, Inc. v. Koratron Company, Inc.,* 375 F.Supp. 1, 62 (N.D.Cal.1974) (use of trademark license to effect a horizontal

territorial division of a market is a *per se* violation of § 1 of the Sherman Act); *Phi Delta Theta Fraternity v. J.A. Buchroeder & Co.,* 251 F.Supp. 968, 969, 974–980 (W.D.Mo.1966) (violation of antitrust laws is an affirmative defense to suits for trademark infringement). The conduct of Sealy is no exception.

Having concluded that Sealy and Sealy Canada are in violation of this Court's injunction, it is arguable that it is not necessary to determine whether the harm to Michigan if an injunction is not issued is greater than the harm to Sealy if an injunction is issued. *See In the Matter of Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 738 F.2d 209, 213 (7th Cir.1984); *SEC v. Holschuh,* 694 F.2d 130, 144 (7th Cir.1982). Nevertheless, an application of this test shows that the balance of harm favors the relief Michigan seeks.

Michigan has lost business and will be excluded from a market where its current business level is 16 to 20 percent of its total sales. Sealy did not dispute that its letters to Michigan's Canadian customers threatening them with lawsuits if they continued to buy from Michigan had their intended effect. Michigan lost customers as a result of the letters. The president of Michigan had conversations with at least three of Michigan's Canadian customers in which each customer stated that it was not buying from Michigan because of the problems Sealy was creating.

■ The amount of business lost by Michigan—16 to 20% of total sales, together with the fact it is business lost in a new market, constitute irreparable harm. Since Michigan has not had a long history of selling in Canada or to Canadian retailers and because its prices are substantially lower than Sealy's prices, Michigan will not have a "yardstick" by which it will be able to measure the sales it could have made and the customers it could have acquired in Canada absent Sealy's unlawful acts. The difficulty in evaluating lost sales, and so damages, renders the harm to Michigan irreparable. *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 383 &

385 (7th Cir.1984); *General Leaseways*, 744 F.2d at 591. Further, courts have found irreparable harm when challenged conduct was likely to result in a similar loss of business. *See Continental Distributing Co. v. Somerset Importers, Ltd.*, 411 F.Supp. 754, 757 (N.D.Ill.1976) (5 to 7 percent loss); *Beaute Craft Supply Co. v. Revlon, Inc.*, 402 F.Supp. 385, 389 (E.D. Mich.1975) (20 to 25 percent loss).

■ The magistrate's finding that Michigan has not accumulated goodwill in Canada ignores the evidence that Michigan has spent significant resources to develop the Sealy name. Its efforts and those made by other licensees in the United States contributed to the development of the Sealy name in Canada. Because of Michigan's promotional efforts, both in Canada and the United States, this case does not present an instance of a "free-rider" problem. *See General Leaseways*, 744 F.2d at 592–93.

Sealy admitted that, after Michigan started selling in Canada, Sealy started advertising for the first time that its mattresses were "made in Canada." The purpose of this campaign obviously was to develop a distinction in the minds of the Canadian consumer that Sealy Canada's mattresses are somehow different. If Sealy is successful in building a distinction between Sealy Canada and Michigan mattresses, Michigan's name will be absent totally from the Canadian market. The absence of a party's name from a market has been held to constitute irreparable harm, and, if Sealy is not enjoined, this harm will continue unabated. *See Erewhon, Inc. v. Northeast Health Food Merchants*, 428 F.Supp. 551, 554 (D.Mass.1977).

The harm Michigan will suffer if no injunction issues must be compared to the harm that might flow to Sealy if an injunction should issue. At the hearing, Kaplan admitted that the only "harm" Sealy was incurring by Michigan's competition was that Sealy Canada might lose customers or sell fewer mattresses because of that competition. Moreover, Sealy Canada's sales have risen since Michigan began selling in Canada. In the period from January through May, 1984, sales of Sealy products by Sealy's Eastern Canadian plant are up 63 percent over the same period last year, and sales for May, 1984, increased 162 percent over May, 1983. The popularity of the Sealy name and Sealy Canada's sales may have increased because of this competition.

■ As Kaplan testified, the only "harm" that Sealy will incur if the injunction issues is that its Canadian subsidiary, and, thus, Sealy may lose some sales to Michigan or will be forced to reduce prices to make sales. That "harm," however, is nothing other than the risk of competition. The purpose of Sealy's actions is to eliminate that risk by restricting Michigan's exports and sales. If the injunction issues, Sealy may lose some sales if it does not meet market prices, but one of Sealy's major licensees, Michigan, will gain sales and pay royalties. Either way Sealy products will be sold. If an injunction issues, they will be sold at a price based on competition; if it does not issue, they will be sold at the price set by Sealy without intrabrand competition. The balance of harm weighs strongly in favor of the issuance of a preliminary injunction.

■ The Court has no difficulty concluding that the public interest will be served by granting injunctive relief pending a trial on the merits. The issuance of an injunction that results in the enforcement of this Court's judgment fosters intrabrand competition and will be in the public interest.

In compliance with Rule 65(c) of the Federal Rules of Civil Procedure, the Court has also considered whether a bond to cover possible damages to Sealy should be required although this question was not addressed in the parties' extensive briefs. Inasmuch as Michigan pays royalties to Sealy on all of its sales and because Sealy cannot seek damages for harm from competition which is the only injury it could suffer, only a bond in the amount of $1,000 to cover costs will be required.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

(1) Pending further order of this Court, Sealy, Inc., its officers, agents and

subsidiaries are preliminarily enjoined from engaging in any conduct whether directly or through its wholly-owned Canadian subsidiary, Sealy Canada, Ltd., that directly or indirectly blocks, inhibits, impedes or restrains plaintiff's competitive efforts to export or sell Sealy products manufactured in the United States in Canada or to buyers having their place of business in Canada.

(2) This injunction shall be effective upon notice of filing an approved cost bond in the amount of $1,000.