### UNITED STATES of America

v.

### Michael D. ANDREAS; Mark E. Whitacre; Terrance S. Wilson; and Kazutoshi Yamada Defendants.

#### No. 96 CR 762.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 30, 1998.

---

Jerry Michael Santangelo, Neal, Gerber & Eisenberg, Chicago, IL, Jeffrey D. Hoeh, Richard L. Klein, Willkie Farr & Gallagher, New York City, for Bloomberg LP.

James T. Phalen, Schwalb, Donnenfeld, Bray & Silbert, Washington, DC, Kevin M. Dinan, John David Shakow, King & Spaulding, Washington, DC, Joseph J. Duffy, Stetler & Duffy, Ltd., Chicago, IL, for Michael D. Andreas.

Bill T. Walker, Granite City, IL, for Mark E. Whitacre.

Robert W. Fleishman, Mark J. Hulkower, Reid H. Weingarten, Steptoe & Johnson, Washington, DC, Kristina M.L. Anderson, Chicago, IL, for Terrance S. Wilson.

Michael Jerry Freed, Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., Chicago, IL, for High Fructose Corn Syrup Antitrust Litigation Class.

Philip A. Guentert, United States Attorney's Office, Chicago, IL, Jerry Michael Santangelo, Neal, Gerber & Eisenberg, Chicago, IL, for United States.

### MEMORANDUM OPINION AND ORDER

MANNING, District Judge.

## I. INTRODUCTION

In late 1996, the court began a journey in search of the truth behind what really happened at the Archer Daniels Midland Company(ADM) when it entered the international lysine market, in 1991. That is, were ADM executives Michael D. Andreas, Mark E. Whitacre, and Terrance S. Wilson guilty of price-fixing in violation of the Sherman Antitrust Act, 15 U.S.C. § 1? The journey ended on September 17, 1998, when a jury convicted all three defendants of conspiring to fix the global price and allocate the sales volume of lysine.[1]

The defendants now offer a plethora of reasons for why they deserve to be acquitted, granted a new trial, or have their judgments of conviction arrested pursuant to Federal Rules of Criminal Procedure 29, 33, and 34. While the defendants move separately, their motions raise, in part, common issues of fact and law applicable to all three defendants. Accordingly, their requests to incorporate each others motions to the extent that they are applicable to each defendant is granted.

## II. BACKGROUND

Andreas, Whitacre, and Wilson are former ADM executives. Andreas was vice chairman of ADM's board of directors and executive vice president. Wilson was an ADM group vice president and head of ADM's Corn Processing Division. Andreas and Wilson were major players at ADM, both having worked there since the early 1970s. Whitacre joined ADM in 1989, as the president of ADM's thennewly formed BioProducts Division, which produces lysine.

The government accused ADM of masterminding the underlying international conspiracy with its foreign competitors, including: Ajinomoto Co. Ltd., (Japan), Sewon America, Inc., (Korea) Kyowa Hakko Kogyo Co., Ltd. (Japan), and Cheil (Korea). By all accounts, ADM's initial entry into the international lysine market spurred competition and caused a serious decline in the global price of lysine; customers reaped the benefits of price competition. Almost overnight, ADM took the lead in the U.S. market share. But it seems that greed spurred ADM to violate the Sherman Act.

The government alleged that in early 1992, ADM, through Wilson and Whitacre, and at the behest of Andreas, joined an international conspiracy with their competitors to fix the price of lysine. Initial discussions with Ajinomoto and Sewon in April 1992, led to a formal meeting between all of the competitors in Mexico City, Mexico, on June 23, 1992. The FBI and the Department of Justice's Antitrust Division caught wind of this plot when, in November 1992, Whitacre alerted the FBI during an investigation of alleged industrial espionage at ADM's Decatur, Illinois lysine manufacturing plant.

Besides price-fixing, Whitacre's criminal escapades include extortion and embezzle-

---

1. Lysine is a chemically synthesized amino acid and primary ingredient in feed additives, *i.e.,* pig food, swine feed, etc.

ment. In April 1991, Whitacre began embezzling money from ADM by filing phony payment vouchers for goods and services never provided to ADM.[2] While common sense suggests that it is not wise to draw attention to yourself while committing a felony, Whitacre decided to throw caution to the wind and take another roll at the dice by attempting to extort $10 million from ADM in order to conceal his embezzlement. Whitacre falsely claimed that Mr. Fujiwara, a Japanese national employed by Ajinomoto, told him that ADM competitors were sabotaging its Decatur plant to disrupt lysine production and harm ADM's market share in lysine. Whitacre related the Fujiwara story to Andreas, indicating that Fujiwara wanted to sell Japanese trade secrets and biotechnology to ADM for $10 million; the deal, of course, to be consummated through Whitacre as the middleman.

The story was inherently suspicious since Whitacre later claimed that Fujiwara lowered his price to $6 million. Andreas contacted an anonymous ADM associate who, through a round about way,(Tr. at 716), caused the FBI to investigate Whitacre's sabotage claims. As it turns out, Whitacre failed two FBI polygraph tests and then admitted that the Fujiwara incident was a hoax, and that Andreas never agreed to buy stolen Japanese biotechnology. Things were looking grim for Whitacre. Although the FBI was unaware of the embezzlement, Whitacre clearly was the prime suspect in the extortion attempt. Snatching victory from the jaws of defeat, Whitacre won a temporary reprieve when he told the FBI that he and other ADM executives were conspiring to fix the global price of lysine, in violation of the Sherman Act. The FBI listened to Whitacre, but declined to inform ADM about the Fujiwara hoax.

Despite his prior deception, the government offered Whitacre an immunity agreement in December 1992. In exchange for immunity from prosecution for the lysine conspiracy, Whitacre agreed to provide completely truthful information to the government, assist the government with its investigation into ADM, and not to commit any crimes. Needless to say, Whitacre did not volunteer information concerning his embezzlement. A two and one-half year covert FBI investigation using Whitacre as a cooperating witness ensued. Over that period Whitacre surreptitiously recorded conspiracy conversations on audio and videotapes between Andreas, Wilson, and ADM's competitors.

On June 27, 1995, the FBI raided ADM's corporate offices, and everyone ran for cover. The government played the investigatory equivalent of "musical chairs" and passed out an assortment of immunity/cooperation agreements to certain ADM executives, including ADM executive Barrie Cox, and to ADM itself. Cox, at the time, was a Vice-president of Sales and Marketing of ADM's Food Additives Division, and was involved with ADM's endeavors in the citric acid market. While Cox was not alleged to be involved in the lysine conspiracy, he was allegedly aware of another uncharged, yet similar, conspiracy allegedly led by Wilson to fix the price of citric acid. The government has always contended that the lysine conspiracy was modeled after the alleged citric acid conspiracy, and sought to introduce Cox's testimony for that limited purpose. *See infra*, § IV D.

Whether they were too slow to grab a deal or simply not offered one, Andreas and Wilson were indicted. ADM eventual-

**2.** Whitacre still adamantly contends that he was framed by ADM in retaliation for his cooperation with "Operation Harvest King" (the FBI's price-fixing investigation). He claims that the payment voucher scheme was knowingly implemented by ADM to induce Whitacre to stay at ADM by secretly supplementing his salary without having to report the additional income to the Internal Revenue Service. He nonetheless pled to the fraud, and U.S. District Court Judge Howard Baker of the Central District of Illinois sentenced him to a term of 108 months of incarceration.

ly pled guilty to price-fixing and paid a $100 million fine. Despite his aid, the government withdrew Whitacre's immunity agreement after finally discovering that he had bilked ADM to the tune of approximately $10 million with his phony voucher scheme. As a result Whitacre once again joined his lysine brothers-in-arms, Andreas and Wilson; only this time as a codefendant facing a potential three year sentence. Cox received immunity pursuant to 18 U.S.C. § 6001 and agreed to testify against all three, in the sense that he would establish that their lysine conspiracy was modeled after the alleged citric acid conspiracy. The court previously held that the government's proffer of evidence demonstrated that any citric acid evidence was admissible as direct evidence against Wilson and Andreas as to the existence of, and their participation in, the lysine conspiracy. The government contends that it felt compelled to immunize Cox, a British national, in order to prevent extradition disputes from delaying the prosecution.

By indicting Whitacre, the government caused its investigation to take a turn for the surreal. After his indictment, Whitacre became a media sensation by announcing that he had secretly taped many of his conversations with his FBI handlers, particularly Special Agent Brian Shepard, during his two-year odyssey as "the ADM mole." Moreover, Whitacre accused Shepard of instructing him to destroy exculpatory portions of the so-called "Whitacre tapes." Whitacre then filed a Section 1983 action against SA Shepard in the Central District of Illinois, alleging mistreatment in violation of his civil rights, which included threatening Whitacre and ignoring Whitacre's threats to commit suicide during the covert investigation.[3] The veracity of Whitacre's allegations are hotly disputed and is the crux of an ongoing due process challenge to the indictment by An-

dreas and Wilson, alleging selective taping and destruction of exculpatory evidence. *See* § IV B.

The FBI's Office of Professional Integrity launched an investigation into Whitacre's allegations. On April 16, 1997, Whitacre met with government counsel and FBI Agent Athena Varounis who recorded the accusations in an FBI 302 report. Similar to his numerous newspaper and magazine interviews, Whitacre claimed that his audiotapes were phony and the FBI was railroading him. To bolster his claim, Whitacre asserted that he had taped conversations with SA Shepard in which Shepard instructed Whitacre to destroy tapes. Whitacre asserted that his wife, Ginger Whitacre, and confidant David Hoech, a Florida agribusiness consultant and ADM shareholder, could corroborate the allegations. Whitacre contended that he related everything concerning Shepard's misconduct to his wife and gave her copies of taped conversations in which Shepard coerced Whitacre to destroy exculpatory evidence. Mrs. Whitacre, in turn, mailed the "Shepard tapes" to David Hoech, enclosed in an old shoe box. Hoech is the leader of the ADM Shareholders Watch Committee who, on occasion, uses the alias "Lamet Vov." Hoech and his cohorts are, to say the least, very upset with ADM's management and alleged corporate abuses within company. In addition to his wife and Hoech, Whitacre also claimed to have related accounts of his ordeal with Shepard to his in-laws, Ron and Sandy Kunkel; and his gardener, Rusty Williams.

Unsurprisingly, Andreas and Wilson moved to dismiss their indictment alleging, in part, violations of their due process rights based on the alleged selective taping and destruction of exculpatory evidence. In December 1997, due to the odd chain of events, the court convened a three-day

---

**3.** Whitacre suffers from bi-polar disorder which frequently causes him to experience bouts of depression. He has made two publicized unsuccessful suicide attempts; the sec-

ond just days prior to his sentencing for his fraud conviction. To date, the court has seen no objective evidence to indicate that Whitacre's suicide attempts were genuine.

evidentiary hearing to investigate Whitacre's allegations. Whitacre's allegations, however, quickly evaporated. Just prior to his fraud sentencing, Whitacre recanted his allegations and voluntarily dismissed his § 1983 action against Shepard.

Andreas and Wilson faced a major road block since the Whitacres and Hoech invoked their Fifth Amendment privileges against self-incrimination. However, the court did hear testimony from FBI agents that Whitacre had not been closely supervised and was frequently permitted to possess audio tapes for a long period of time, and even recorded conversations with tapes Whitacre purchased for himself, arguably in violation of FBI policy. Most tellingly, the FBI admitted that it did not possess all of the tapes which they had given Whitacre. Equally troubling, it had no accurate means to precisely determine how many tapes Whitacre failed to return since they kept no inventory of blank tapes given to him. It was not the FBI's finest hour.

In addition, expert testimony indicated that there were significant erasures and gaps in the tapes Whitacre did submit to the FBI. Finally, Andreas and Wilson tendered, for an *in camera* inspection, an audiotape containing a conversation between Whitacre and Hoech, in which Hoech acknowledges that he did "get rid of" tapes that Whitacre sent him. To date, neither the court nor the parties know whether Hoech was discussing destruction of exculpatory evidence, or whether Shepard had, in fact, compelled Whitacre to destroy evidence. During a subsequent interview with the FBI, Hoech denied that Whitacre sent him any tapes.

In light of Whitacre's allegations and the circumstantial evidence provided by the experts and the FBI agents, the court granted Andreas and Wilson wide latitude to adduce evidence at trial regarding possible destruction of tapes, but only for the limited purpose of challenging the authenticity/reliability of the tapes.

At trial, the jury heard the audiotapes and viewed videotapes surreptitiously made by Whitacre, and at times, undercover FBI agents. For example, an undercover FBI agent posing as a waitress recorded Defendant Andreas at a meeting with Hirokazu Ikeda in Irvine, California on October 25, 1993 where they allegedly discussed the price-fixing scheme. Irvine was one of numerous meetings between the defendants, including: Mexico City, Hawaii, Chicago, Vancouver, Paris, Tokyo. The defendants asserted that all the tapes memorialized legitimate trade association meetings between competitors, discussing tricks of the trade and so forth. The government cried conspiracy. The jury obviously agreed with the government and here we are.

Now, in their post-trial motions, the defendants assert that a culmination of evidentiary errors and governmental misconduct deprived them of a fair trial, for which they deserve a new one. Alternatively, they argue that the evidence does not support their convictions, and thus they should be acquitted.

### III. *STANDARD OF REVIEW*

When reviewing a motion for judgment of acquittal pursuant to Fed. R.Crim.P. 29(c), the Seventh Circuit mandates that the court determine:

whether at the time of the motion there was relevant evidence from which the jury could reasonably find [the defendants] guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government ... bearing in mind that it is the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences (internal quotations omitted).

*United States v. Reed*, 875 F.2d 107, 111 (7th Cir.1989), *quoting United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir. 1986). In short, the court views all the evidence in the government's favor and is absolutely barred from second-guessing

the jury's credibility determinations or findings of fact. Instead, the court merely assesses the record to determine if all the admissible evidence supports the defendants' adjudication of guilt beyond a reasonable doubt. *Id.*

In the same vein, motions for a new trial under Fed.R.Crim.P. 33 are granted where, unlike here, the defendants demonstrate that the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *Reed,* 875 F.2d at 113. Motions for new trial are disfavored and granted only in the face of exceptional circumstances such as legal errors or omissions which deprived the defendants of a fair trial. *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir.1989).

Post-trial motions for an arrest from judgment pursuant to Fed.R.Crim.P. 34 may be granted only if the indictment does not charge an offense or the court is without jurisdiction. *United States v. Maloney,* No. 91 CR 477, 1994 WL 96673 (N.D.Ill. Mar.23, 1994), *citing United States v. Whitted,* 454 F.2d 642, 646 (8th Cir.1972). Neither requirement is satisfied here and the Rule 34 motion is, accordingly, denied with prejudice.

## IV. *ANALYSIS*

### A. Applicability of per se rule

#### 1. Sales volume allocation agreement

Andreas argues that he must be acquitted or granted a new trial because of several evidentiary and legal deficiencies related to the charge that he allocated the sales volume of lysine. He argues that sales volume allocation is not per se illegal since no prior judicial opinion has adjudicated it as such. Nor, Andreas claims, can the government argue that a sales volume allocation is equivalent to an output restriction (a per se offense), since government counsel stated during trial that it was not prosecuting him for an output

restriction. Assuming sales volume allocation is not per se illegal, he accordingly contends that it is conduct governed by the Rule of Reason which attaches criminal liability only if economic or expert testimony establishes that the sales volume allocation unreasonably restrained trade. *See, generally State Oil Co. v. Khan,* 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). Since the government produced no such evidence, Andreas argues he is entitled to an acquittal.

Next, Andreas contends that the court erroneously instructed the jury that it could convict him if, based on the evidence adduced at trial, it found beyond a reasonable doubt that Andreas had the requisite intent to agree to either fix the price or allocate the sales volume of lysine. Since the jury rendered a general verdict, it is uncertain whether the jury found evidence of guilt as to both price-fixing and sales volume allocation, or only the latter. Assuming, the jury only found him guilty as to sales allocation, and based on Andreas' view that sales volume allocation is not a per se offense, he contends that the court constructively amended the indictment to permit the jury to convict him of a separate uncharged offense—sales volume allocation—which is legal. That is, the alleged constructive indictment caused the jury to convict Andreas for legal conduct.

Finally, if the court holds that sales volume allocation is a per se offense, Andreas asserts this would be the first adjudication. As such, he asserts that his conviction is fundamentally unfair since he never received fair notice that sales volume allocation is a crime thereby denying him due process as recognized in *Lanzetta v. New Jersey,* 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), and *Bouie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964).

In its response brief and at oral argument, the government argued that sales volume allocation is equivalent to an output restriction which is a per se offense. The rationale for the argument is that the

label/characterization "sales volume allocation" is irrelevant where, as here, the agreement substantively constitutes a form of price-fixing. Thus, the government argues that the "either or" jury instruction is harmless since both acts were per se offenses, the existence of which was supported by the evidence adduced at trial. Moreover, the government contends that no constructive amendment occurred because the sales-volume allocation, as alleged in the indictment, was in furtherance of the single price-fixing conspiracy, and not necessarily in furtherance of the price agreement, as Andreas implies.

■ Generally, the Rule of Reason governs antitrust violations, *State Oil Co. v. Khan*, 522 U.S. 3, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997), and requires the government to prove via economic evidence and/or expert testimony that a particular practice (like price-fixing) constitutes an unreasonable restraint of trade. The reasonableness of a particular business practice is determined by balancing the positive and negative effects the practice has on the relevant market. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). Per se violations are the narrow exception to the general rule, in which the alleged misconduct is so inherently unreasonable that it is presumed to violate the Sherman Act and no factual inquiry into its effect on commerce is necessary. *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

■ Andreas concedes that an output restriction is a per se violation of the Sherman Act. Accordingly his argument for acquittal or a new trial wins or loses depending on whether sales volume allocation is a per se offense. In its September 17, 1998 order, the court held that the sales volume allocation was governed by the per se rule since, as alleged in the indictment and evidence at trial had arguably shown, the sales volume allocation was necessarily in furtherance of the price-fixing. In retrospect, the September 17

Order is ambiguous because it did not clearly specify that "price-fixing" is a category which includes agreements to directly set prices, *United States v. Trenton Potteries Co.*, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927), and output restrictions which artificially inflate prices by intentionally reducing product supply.

■ As noted by the government, price-fixing is not necessarily a straightforward agreement as to price. Antitrust precedent characterizes any means or methods intentionally calculated to eliminate market competition and manipulate price to constitute price-fixing. *See generally, National Society of Professional Engineers v. United States*, 435 U.S. 679, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978); *see also United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Output restrictions are classic per se violations which personify the law of supply because product scarcity causes consumers to pay inflated prices to satisfy demand. Unlike pure supply and demand, competitors use output restrictions to inflate profit by thwarting competition by intentionally limiting product availability. *See generally, National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979); *General Leaseways v. National Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir.1984); *Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221 (7th Cir.1978), citing *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). The law is clear that output restrictions are inherently anti-competitive and therefore per se illegal.

■ That said, the first step to resolving this issue revolves around whether the government disclaimed output restrictions as a cognizable theory for liability. While objecting to the line of questioning during the cross-examination of FBI Agent Rob-

ert Herndon, government counsel stated that the indictment charged Andreas with sales volume allocation and not with an output restriction. Agent Herndon further added that the government was never aware of how much lysine the conspirators ever actually produced.

Andreas erroneously construes the statement by government counsel to mean that the government never considered sales volume allocation to be equivalent to an output restriction, implying that no output restriction could exist unless the government knew how much lysine the conspirators actually produced. Based on the government's theory of liability, actual lysine output was irrelevant except to determine whether actual output complied with the predetermined amount agreed upon by the conspirators. But for this minor ambiguity in the record, the government has consistently asserted that limiting the availability of lysine—regardless of the respective manufacturers' production capacity—constitutes a per se violation in that it artificially inflates prices and quashes competition. *See, e.g. General Leaseways, Inc. v. National Truck Leasing Ass'n,* 744 F.2d 588 (7th Cir.1984) (Posner, J.)

■ The indictment alleged a single conspiracy to price-fix through two distinct methods: a direct agreement to set price; and sales volume allocation which, as discussed above, restricts output. A constructive amendment to an indictment arises when the offense proven at trial was not alleged in the indictment, *United States v.. Remsza,* 77 F.3d 1039, 1043 (7th Cir.1996), or a complex set of facts distinctly different from those alleged in the indictment are presented to the jury, *United States v. Kuna,* 760 F.2d 813, 817 (7th Cir.1985), or when the facts adduced at trial establish a substantive offense different from that charged in the indictment. *Id.* Direct price agreements and sales volume are two sides to the same price-fixing coin. The indictment expressly identifies both as the method and means of effectuating the price-fixing conspiracy, and the evidence established the existence of all three. As such, no constructive amendment occurred at trial.

Tellingly, Andreas never challenges the contention that, as alleged and argued in court, the application of the sales volume allocation agreement is inherently unreasonable. He avoids the issue by removing the sales volume allocation practice outside the purview of the per se classification through the very semantics he attributed to the government. Andreas criticizes the government for arguing that sales allocation agreements, by analogy to other antitrust allocation agreements, are per se illegal since the nomenclature "sales volume allocation" has never been formally recognized as a per se offense in antitrust jurisprudence. Andreas undermines his "label" argument by conceding that the applicability of the per se rule depends on whether the substance of the business practice in question, regardless of its name, is the type of pernicious anticompetitive conduct which has a "demonstrable economic effect." *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 58–59, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). Accordingly, Andreas' motions for a judgment of acquittal and new trial based on constructive amendment of the indictment and application of the per se rule are denied with prejudice.

Here, there is little doubt that the sales volume allocation was, by design, an output restriction calculated to manipulate price without directly setting the price. The evidence revealed that Whitacre related to Andreas and Wilson that lysine prices could be increased by allocating volume, like that used in the alleged citric acid conspiracy. Wilson and Andreas acknowledged Whitacre's suggestion. Barrie Cox's direct testimony corroborated Whitacre, stating that sales volume agreement insures that competitors do not circumvent the price agreement by secretly selling a product at an undercut price. Similarly, Kanji Mimoto of Eurolysine

(Ajinomoto's European subsidiary) confirmed that the volume allocation was the key component to success, otherwise manufacturers would have to match their competitors' price or lose customers thereby reducing market share.

A picture is worth a thousand words, but is nothing when compared to a videotape, and the government has Andreas on the video haggling with Kazutoshi Yamada over how much market share the individual competitors deserved within their price-fixing scheme, based on their respective market dominance. Since the sales volume allocation was, in essence, an output restriction that is patently illegal under clearly established antitrust law—both civil and criminal—Andreas has no basis to claim that he was unaware his actions were illegal. The degree to which the conspirators concealed their scheme with sham meetings propped up with phony agendas while secretly haggling over price dispels any plausible claim that Andreas was unaware that he was breaking the law. Mimoto admitted at trial that the conspirators were fully aware that they were breaking U.S. law, and indeed, frequently met outside the United States to impede detection by U.S. law enforcement.

## 2. Sufficiency of the evidence

Finally, Andreas and Wilson claim that there is insufficient evidence to sustain their convictions. In a challenge to a conviction based on a claim of insufficiency of the evidence, the court views the evidence presented at trial in the light most favorable to the government, and the conviction will be upheld if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *United States v. Taylor*, 31 F.3d 459, 464 (7th Cir.1994).

There is an abundance of evidence that, when viewed in a light most favorable to the government, sufficiently supports Andreas' and Wilson's convictions for price-fixing. That evidence includes, but is not limited to, the following:

•Ajinomoto executive Kanji Mimoto testified that in his capacity as an executive for Ajinomoto's subsidiary, Eurolysine, he met with Whitacre and Wilson at the June 1992 Mexico City meeting where they discussed allocating the sales volume of lysine. (Tr. 910–14). Mimoto identified Wilson as the main spokesman for ADM. Mimoto related that Wilson wanted ADM to have the same quantity with respect to allocation to be received by Ajinomoto.(Tr. 917) Mimoto admitted that it was common sense to know that their conduct was illegal.

•As to Whitacre, Mimoto testified that he discussed the pricing agreement with Whitacre during an August 1992 telephone conversation.(Tr. 936) Whitacre suggested that the lysine price should be increased despite a set agreement on the sales volume allocation. Whitacre invited Mimoto to visit the ADM lysine factory to observe ADM's manufacturing capacity for lysine to aid in the volume allocation negotiations, indicating that ADM would receive a larger quantity under the sales volume allocation based on its manufacturing capacity. (Tr. 938) During the trip to the lysine factory, Mimoto & Hirokazu Ikeda met Whitacre at the Chicago Marriot Hotel. Ikeda was the general manager of Ajinomoto's "international department." Mimoto admitted that ADM and Ajinomoto confirmed the price agreement during the ADM factory tour.

•Mimoto testified that Wilson, Whitacre, Masaru Yamamoto of Kyowa Hakko, and Jhom Su Kim of Cheil, met in October 1992 in Paris to confirm the then-present price levels and price schedule for lysine. Wilson and Whitacre agreed to the CIF (price for shipping from port-to-port) price schedule for lysine sales between respective markets—the United States, Asia, Korea and Japan. The CIF price was $2.30 for mid-October and $2.50 after November 1, 1992 until January 1993.

●Mimoto further testified that the lysine price agreement failed and prices dropped because the manufacturers did not keep prior promises regarding price. Price could not be maintained unless an agreement was made as to sales volume allocation. Consequently, the manufacturers convened a meeting in June 1993 at Vancouver where they agreed yet again on price, but failed to agree on the sales volume. Once again, Wilson and Whitacre were present at the meeting. Finally, at a December 1993 Tokyo meeting at the Palace Hotel, Wilson and Whitacre met with Kazutoshi Yamada of Kyowa Hakko, Ikeda, Jacques Chaudret of Eurolysine (Ajinomoto's European subsidiary), where they agreed on the sales volume allocation.

●Hirokazu Ikeda testified that he met with Andreas in October 1993 at Irvine, California with Whitacre. The government presented a video and audio tapes of that meeting at which Andreas discussed the volume and lysine capacity to secure a volume allocation equivalent to Ajinomoto.

●Alan Crouy, a former Eurolysine executive, testified that he participated at the 1992 Mexico City Meeting, and confirmed that Wilson was a prominent figure in negotiating the quantity allocation agreement. In addition, he confirmed Mimoto's testimony regarding the October 1992 Paris meeting.

●Barrie Cox, former food additives executive with ADM, testified that he and Wilson were involved in citric acid price-fixing. The conspiracy had three steps: (1) set allocation; (2) establish a compensation scheme in which manufacturers who exceeded their volume had to repay other manufacturers for their lost profits; and (3) maintain the trade association cover to conceal their illegal acts. The conspiracy was strikingly similar to the lysine conspiracy in that the participants met during trade association meetings to discuss market conditions, volume allocations, and the like. The government produced a taped conversation between Andreas, Wilson, and Whitacre in which they confirmed that they were modeling the lysine conspiracy after the citric acid conspiracy.

●In an October 12, 1993 conversation, Andreas acknowledged that an independent auditor should be utilized to ensure that the manufacturers abided with the volume allocation. (1B46, 29). Andreas told Whitacre that "our feeling is that (coughs) any business that we lose, we're gonna take back with a higher market," (1B46, 37). Andreas further stated that he wanted to meet personally with Ikeda (presumably at the Irvine meeting) for an hour. That confirms, in part, Ikeda's testimony that he did meet personally with Andreas to discuss the conspiracy.

●In another October 12, 1993 conversation, Whitacre, Andreas, and Wilson discuss the sales volume agreement.

●In an October 13, 1994 conversation, Andreas, Wilson, and Whitacre discuss how they compared the results of the lysine conspiracy. They mentioned that the "numbers" comparison is similar to monthly comparisons used in the citric acid conspiracy.

●In a recorded conversation of the October 25, 1993 Irvine meeting, Andreas discussed volume allocation with Yamada and Ikeda, noting that the manufacturer's suffered low prices because the plan was not as successful as ADM had hoped. Andreas then goes on to discuss how much quantity each manufacturer should receive under the allocation agreement

The audio and videotapes revealed that Andreas, Wilson, and Whitacre had discussed manipulating the sales volume allocation in a calculated effort to increase price. The videotape conversations between Andreas and Kazutoshi Yamada at the October 25, 1993 Irvine Meeting clearly dispelled any question in the minds of the jurors as to Andreas' keen interest in controlling the sales volume to ensure that

prices remained high. Recall, at Irvine, Andreas told his "competitors" that sales volume was the key to ensure price. At the June 28, 1994 Vancouver meeting, Andreas and Whitacre discussed volume and price; Andreas inquired whether the lysine price was meeting the $.85/lb, price objective and suggested that the competitors should be encouraged to agree to increase price by another nickel.

Of course, Andreas and Wilson claim that other conversations demonstrated they lacked intent and were lying to deceive their competitors in order to get legal market information. Based on the evidence, the court finds that it was sufficient to support the jury's finding of guilt beyond a reasonable doubt. Here, there is little doubt that the sales volume allocation was, by design, an output restriction calculated to manipulate prices without directly setting the price. In addition, the recorded conversations and co-conspirator testimony established that the defendants did, in fact, also agree to directly set the price of lysine. The degree to which the conspirators concealed their scheme with sham meetings propped up with phony agendas while secretly haggling over price dispels any plausible claim that Andreas and Wilson were unaware or did not intend to break the law. Accordingly, Andreas' and Wilson's motions for acquittal, arrest from judgment, and new trial based on insufficient evidence are denied with prejudice.

## B. Due process claims

### 1. Motions to suppress for selective taping and destruction

■ Citing *United States v. Feekes,* 879 F.2d 1562 (7th Cir.1989); *United States v. Faurote,* 749 F.2d 40 (7th Cir. 1984); *Franzel v. Kerr Mfg. Co.,* 959 F.2d 628 (6th Cir.1992); and *United States v. Chaudhry,* 850 F.2d 851 (1st Cir.1988), Wilson and Andreas argue that the admission of the Whitacre tapes deprived them of a fair trial, asserting that the culmination of: (1) alleged selective taping and destruction of exculpatory tapes; (2) the indictments of Yamada and Whitacre; (3) the government's refusal to immunize Ginger Whitacre and Hoech; and (4) the court's exclusion of FBI Agent Athena Varounis' testimony, denied them of their rights to present evidence of their actual innocence recognized in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny. These claims, except for suppression of Varounis' testimony were previously resolved by the Court's April 16, 1998 order.

Wilson and Andreas offer no new arguments or evidence articulating how the admission of the tapes violated their rights. To the contrary, they concede that the court granted them ample latitude to challenge the reliability of the audio and videotapes presented at trial, acknowledging that they established: (1) the FBI admitted it did not scrupulously supervise Whitacre; (2) no catalog was maintained to ascertain how many audiotapes Whitacre returned; (3) the tapes had numerous erasures and gaps probative of potential selective taping and destruction; (4) that FBI agents often had to instruct Whitacre to avoid using suggestive words to avoid entrapping the conspirators; (5) Whitacre recorded conversations which appeared to be at odds with the Attorney General's Recording Policy, as they applied to Whitacre; and (6) Whitacre often used unauthorized recording equipment and had the capability of removing audiotapes from their protective enclosure of recording equipment. As held pretrial by the court and argued by the defendants, the reliability of the audiotapes is ultimately a question of fact to be determined by the jury.

Viewed in a light most favorable to the government, *Reed,* 875 F.2d at 111 (7th Cir.1989), there was substantial corroborative testimony from cooperating conspirators and videotapes acquired independent of Whitacre which implicated all three defendants. The court cannot overturn the jury's verdict based wholly on the defendants' displeasure with the jury's credibili-

ty determination. Accordingly, the motion to acquit or grant a new trial based on allegations of selective taping and destruction of evidence is denied with prejudice as to Andreas and Wilson.

### 2. Agent Varounis' testimony

■ Wilson and Andreas argue that the court erred in excluding the testimony of FBI Agent Athena Varounis. Varounis, a Supervisory Special Agent assigned to the FBI's Office of Professional Responsibility ( the FBI equivalent of the "internal affairs" unit), interviewed Whitacre at the Antitrust Division's Chicago Office, on April 30, 1997, as part of the FBI's investigation of Whitacre's allegations of possible destruction of evidence and Shepard's alleged obstruction of justice. Keep in mind that at that time Whitacre was facing indictments for defrauding ADM, in addition to the price-fixing conspiracy.

At the interview, Whitacre recounted his prior allegations that SA Shepard instructed him to destroy (presumably exculpatory) audiotapes recorded during the ADM investigation. He also claimed that he had surreptitiously recorded tapes of his conversations with Shepard via hidden tape recorders, in which Shepard instructed Whitacre to "get rid of the tapes." In particular, four to five tapes which contained information which Varounis described in her FBI 302 report as being "favorable to ADM executives."

At trial, Andreas and Wilson moved to call SA Varounis to testify so that she could relate Whitacre's allegations of selective taping and destruction of exculpatory evidence, arguing that Whitacre's allegations were declarations against penal interest pursuant to Fed.R.Evid. 804(b)(3), and hence, admissible notwithstanding the hearsay rule. The court denied their motion and excluded Varounis from testifying. Andreas and Wilson, in their post-trial motions, assert that excluding Varounis from testifying deprived them of a fair trial and violated their rights to due process. They argue that Whitacre's allegations are

against his penal interest sine they expose him to criminal liability for obstructing a government investigation. They further argue that his allegations are admissible since they have been corroborated by Ginger Whitacre and David Hoech. In response, the government contends that Whitacre's statements were inadmissible because they were not against his penal interest nor were corroborated by the surrounding circumstantial evidence at the time he rendered them.

■ Fed.R.Evid. 804(b)(3) carves a limited exception to the hearsay rule for declarations against penal interest premised on the theory that individuals do not make inculpatory statements and expose themselves to criminal liability unless the statements are true. *Williamson v. United States,* 512 U.S. 594, 598, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). The proponent of admission must demonstrate that the statement was: (1) against the declarant's interest at the time it was made; (2) corroborating circumstances exist indicating the trustworthiness of the statement; and (3) the declarant must be unavailable. *Williamson v. United States,* 512 U.S. 594, 598, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *United States v. Garcia,* 897 F.2d 1413, 1420 (7th Cir.1990). The court, weighing the totality of the circumstances, must be satisfied that the statement tended to expose the declarant to liability at the time it was made. *United States v. Butler,* 71 F.3d 243, 251–253 (7th Cir. 1995); *see also United States v. Silverstein,* 732 F.2d 1338, 1345–46 (7th Cir. 1984); *United States v. Nagib,* 56 F.3d 798, 804 (7th Cir.1995), *quoting Williamson,* 512 U.S. at 594, 114 S.Ct. 2431 (1994). The parties agree that Whitacre, by virtue of his Fifth Amendment privilege, was unavailable. They dispute whether Whitacre's allegations are truly against his penal interest and whether they are sufficiently corroborated.

■ Wilson concedes that the record clearly establishes that Mark Whitacre

does not live by the first point of the boy scout law—to be trustworthy—but contends, citing no authority, that the credibility determination for Rule 804(b)(3) statements are decided by the jury, and not the court. Yet, *Garcia* says the exact opposite, giving trial courts considerable discretion, tempered only by the rules of evidence, to assess witnesses' credibility and demeanor as part of threshold admissibility determinations. *Garcia,* 897 F.2d at 1421 (7th Cir.1990), *citing United States v. Guinan,* 836 F.2d 350, 355 (7th Cir.1988); *see also Silverstein,* 732 F.2d at 1347 (judges not required to ignore evidence that statements are fabrications). Factors to consider when making that determination include whether the statements were: (1) spontaneously made, *Gooch v. McVicar,* 953 F.Supp. 1001, 1007 (N.D.Ill.1997) (Moran, J.); (2) made to curry favor with the authorities, *Garcia,* 897 F.2d at 1421; (3) made after the declarant was advised of his *Miranda* rights, *Id.;* and (4) corroborated by the surrounding circumstances to suggest that the statements are trustworthy. *Id.* Authorized to make that threshold credibility determination, the court finds that the circumstances surrounding Whitacre's allegations indicate that they were neither against his penal interest nor adequately corroborated.

### a. Against penal interest

██ Under Wilson's theory, Whitacre's allegations of destruction and selective taping exposed himself to the risk of prosecution for obstruction of justice. Any individual who "corruptly ... impede[s] ... the due administration of justice" is liable for a fine not more than $5,000 or imprisonment of five years. 18 U.S.C. § 1503. The Seventh Circuit construes § 1503 broadly to include "the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *United States v. Cueto,* 151 F.3d 620, 630 (7th Cir.1998), *citing United States v. Griffin,* 589 F.2d 200, 206 (5th Cir.1979) (internal citations omitted).

Assuming the harshest penalty under the Federal Sentencing Guidelines were imposed, Whitacre would face a maximum of approximately 24 months for obstruction of justice. *See* U.S.S.G. § 2J1.2 (1998 Manual). In contrast, the stiffest sentence available under U.S.S.G. § 2R1.1 (price-fixing with a level 17 adjustment) is 30 months.[4] In addition, obstruction only carries a $5,000 fine, while the antitrust violation carries a maximum fine of no less than one to five percent of the volume of commerce affected, but no less than $20,000. While the parties may dispute exactly how much commerce was actually affected, based on the evidence adduced at trial, one could assume for the sake of argument that it was substantial.

Clearly the price-fixing is far more burdensome than the obstruction of justice charge. Comparisons between the two charges is probative of the statements' reliability only if Whitacre knew the difference. Maybe for all Whitacre knew, obstruction was the meatier of the two offenses. However, Whitacre holds a J.D., M.B.A., B.S./M.S. in animal science, and a Ph.D in nutritional biochemistry. Over the objection of counsel, he successfully argued a motion before the court to be tried in absentia. Indeed, during argument on the absentia motion, Whitacre professed that he has working knowledge of the law. Do not forget that he is also

---

4. This analysis does not account for the differing collateral consequences incidental to a crime of fraud or dishonesty as opposed to an antitrust offense; Whitacre's prior fraud conviction renders that question moot. *See, e.g.,* Fed.R.Evid. 609(a)(2) (conviction for a crime of dishonesty or making false statements is always admissible, regardless of punishment, notwithstanding the standard ten-year time limit provided under Fed.R.Evid. 609(b)). This discussion is not intended nor should it be construed as *the court's opinion or belief* as to what sentence *any* of the defendants should or might receive for their price-fixing convictions.

no stranger to the Federal Sentencing Guidelines, having been sentenced by Judge Baker only four months earlier. Whitacre certainly had the motive to research the obstruction of justice statute and the guidelines since the government not-so subtly hinted at the December 1997 evidentiary hearing that, if the statements were true, individuals could be indicted for obstruction. Of course, this theory is supported only by speculation. What does matter, however, is the fact that Whitacre's statements were not spontaneous and were subsequently recanted.

Whitacre's allegations arose several months *after* his indictment for price-fixing. The circumstances of the investigation gave Whitacre the unique position of literally avoiding a criminal indictment by merely making self-serving accusations of destruction of evidence. As noted in the record, he often had sole possession of the tapes for long periods of time. If he had successfully caused the court to suppress the tapes, Whitacre would have saved himself from a very serious fine and jail time, in comparison to that which he would face for any possible obstruction of justice charge.

More importantly, Whitacre recanted his allegations during a January 26, 1998 meeting with the government just prior to his fraud sentencing. At that meeting, Whitacre admitted that Agent Shepard had not instructed him to destroy tapes, indicating that a friend at ADM promised that the company would indemnify Whitacre from the civil litigation derivative to the criminal prosecution. That admission put Whitacre in very hot water since the government would likely get the tapes admitted into evidence by rebutting claims of destruction of evidence with Whitacre's recantation. In addition, the government

could conceivably indict Whitacre for obstructing the criminal prosecution.[5]

The *Williamson* Court reasoned that 804(b)(3) is premised on the theory that even dishonest people do not inculpate themselves unless it is true, but quickly cautioned that the best lies are those intertwined with elements of truth. *Williamson*, 512 U.S. at 599–600, 114 S.Ct. 2431. Whitacre's conduct epitomizes *Williamson*'s warning. Mixed-bag confessions larded with arguably inculpatory and exculpatory statements are inherently suspect. The theoretical underpinnings of 804(b)(3) are trumped where, as here, theory cannot be squarely reconciled with the inherently unpredictable and often questionable trustworthiness of defendants like Whitacre. A suspect might confess to a burglary that transpired somewhere else at the same time he committed a homicide; taking the burglary conviction to avoid a death sentence. Similarly, a defendant might convince a friend to confess for the other's crime, thinking that the chances of the friend being prosecuted are slim. *See, e.g., Silverstein*, 732 F.2d at 1346.

■ Here, Whitacre's ploy was patently transparent from its inception and is consistent with his documented pattern of deceit. ADM suspected him of embezzling, so he extorts money from them to conceal the embezzlement. The government suspects him of the extortion, so he cuts a deal with the government to spy on ADM for immunity—an agreement void *ab initio* due to his ongoing embezzlement. Once the government yanked his immunity, he turned on the government and attempted to sabotage the admission of the primary evidence to be used against him in the lysine prosecution. The government argues that Whitacre fabricated the allegations in order to thwart the lysine prosecution,[6] characterizing the attempt as "in an

---

5. Again, the analysis is not intended nor should it be construed as an invitation to further prosecute Mark Whitacre.

6. At oral argument, government counsel claimed that Whitacre's allegations were motivated to thwart the lysine prosecution and then offered corroborative evidence never admitted at trial. The evidence was a tape of a

upside-down way 'akin to a statement to curry favor with the authorities.'" It does not elaborate how Whitacre could curry favor, but the logic, in a strange way, makes sense. That is, instead of hoping that the government would be lenient, he took affirmative steps to preclude the government from prosecuting him and his counterparts Andreas and Wilson.

### b. Corroboration

Assuming *arguendo* that the statements were against his interest, they were not sufficiently corroborated. Importantly, there are no statements to corroborate since Whitacre recanted his allegations. Contrary to Wilson's assertions, the FBI agents who testified at trial never corroborated Whitacre's allegations. While their testimony establishes that Whitacre did have the opportunity to destroy or selectively tape conversations, they never confirmed that Agent Shepard instructed Whitacre to destroy evidence. Rather, they have vehemently denied the allegations ever since they were first made.

Furthermore, Ginger Whitacre is not sufficiently reliable to corroborate her husband's testimony. Depending on the nature of the marriage, spouses can either be biased or prejudiced toward each other. Hence, the court cannot join the government in its assumption that Ginger Whitacre would necessarily lie to exculpate her husband. However, lingering questions regarding the extent of assistance she provided her husband in establishing secret offshore account in the Cayman Islands and Switzerland—even after he was indicted—lends credence to the possibility that

she would be equally inclined to assist her husband to avoid conviction for the lysine offense.

Mrs. Whitacre claimed during her interview with Agent Varounis that she actually heard the Shepard tapes, and volunteered to submit to a polygraph that Shepard had attempted to coerce her husband into destroying evidence. Wilson asserts that Mrs. Whitacre's offer to undergo a polygraph is probative of trustworthiness. While there is no clear consensus as to whether polygraph results are reliable, *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 1265–66, 140 L.Ed.2d 413 (1998), the court need not recount the various factors that it must weigh in determining the admissibility of polygraph evidence since the simple fact is Ginger Whitacre never submitted to one. An offer to submit to a polygraph examination is only probative if the surrounding circumstances suggest that Ginger Whitacre was serious. Mrs. Whitacre made this offer while at the Antitrust Division's Chicago Field Office, and the court seriously doubts the government was ready and capable of taking Mrs. Whitacre up on the offer at that very moment. Even if it were, polygraph examinations are not wholly reliable and can produce false indications of either deception or honesty. While the FBI might place some faith in the test, the court finds greater probative value from Ginger Whitacre's subsequent conduct. Apparently Mrs. Whitacre's whereabouts were unknown for some deal of time prior to the pretrial evidentiary hearing. When she did appear, she invoked her privilege against self-incrimination. While the court

purported conservation between Whitacre and his fraud confederate David Paige, which supposedly verifies the government's contention. At first, counsel insisted that the court could consider evidence outside the record, then immediately retracted his assertion. Government counsel is reminded that the scope of post-trial motions is limited to evidence entered into the record. *United States v. Baker*, 78 F.3d 1241, 1245 (7th Cir.1996) (limiting sufficiency of evidence claims to evidence actually presented at trial). If the au-

diotape is as persuasive as counsel now contends, it should have been presented at the pretrial evidentiary hearing, or at the latest, during trial when Wilson invoked 804(b)(3) to admit Varounis' testimony. It undoubtedly would have assisted the court in ruling much faster on the thorny issues related to the motions to suppress for selective taping and Whitacre's allegations in general. Thus, the government has waived admission of the audiotape to support its argument.

cannot hold that against her as an admission of guilt, it does give weight to the inference that she would remain silent instead of perjuring herself in further support of her husband's deceptions.

Likewise, David Hoech provides little probative, let alone corroborative, evidence of Whitacre's allegations. From the pretrial evidentiary submissions, it is plainly clear that he associated himself with Whitacre in the belief that, at the time, Whitacre was attempting to expose corruption at ADM. Hoech is quite prolific in his ADM Shareholders Watch Letters and frequently records conversations with other persons. Wilson contends that the recorded conversation (recorded by Whitacre) between Hoech and Whitacre establishes that Whitacre did in fact, send exculpatory evidence to Hoech which was subsequently destroyed. However, in the conversation, Hoech never describes the contents of the tapes which were allegedly destroyed. The court is not convinced as to precisely what they were discussing. Moreover, both Hoech and Whitacre, in subsequent FBI 302 reports, denied ever destroying evidence and then subsequently invoked their privileges against self-incrimination to avoid further questioning on the issue at the pretrial evidentiary hearing. By remaining silent, the Whitacres and Hoech prevented the government from fully investigating a criminal matter that it never believed occurred in the first instance. At the same time, they prevented the government from acquiring evidence to use against them for potentially obstructing the lysine prosecution.

Finally, the court still wonders whatever happened to Ron and Sandy Kunkel, as well as Rusty Williams. Initially, Whitacre claimed they could corroborate his claims, but neither the government nor defense counsel ever called them to testify at the evidentiary hearing. Their sudden flight into obscurity casts further doubt that Whitacre's allegations were ever true. Given Whitacre's proclivities for deceit and the dubious motives of his corroborative

witnesses presented by Wilson, the court finds that Wilson has failed to make a threshold showing of credibility and reliability to warrant admission of Agent Varounis' testimony. Accordingly, the court denies the motion for acquittal, new trial, and arrest from judgment based on the exclusion of her testimony as to Wilson and Andreas.

## C. Motions to suppress Barrie Cox's testimony

### 1. Barrie Cox's interview and the ADM plea agreement

Wishing to leave no stone unturned, Wilson has, for the third time, moved to suppress Barrie Cox's statements regarding citric acid. Wilson's theory in support of suppression is twofold. He claims that introducing Cox's statements derived from a grant of immunity to Cox pursuant to 18 U.S.C. § 6001 somehow deprived Wilson of his Fifth Amendment privilege against self-incrimination as provided for in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). Next, he asserts that, as an ADM employee, he is a third-party beneficiary to the use immunity which the government extended to ADM pursuant to Fed.R.Crim.P. 11(e)(6) in the interim between negotiation and ratification of the ADM plea agreement.

 Essentially, Wilson has filed a second motion for reconsideration concerning a perceived violation of his *Kastigar* rights based on Barrie Cox's immunity agreement. "This [c]ourt's orders are not 'mere first drafts, subject to revision and reconsideration at a litigant's pleasure.' " *Thompson v. Perryman*, No. 98 C 1596, 1998 WL 786221 (N.D.Ill. Nov. 6, 1998) (Plunkett, J.). On two prior occasions, the court clearly and unambiguously held that Wilson's *Kastigar* argument is without merit. *Kastigar* is a Fifth Amendment guarantee intended to prevent the government from prosecuting a witness based on inculpatory statements made pursuant to a grant of immunity. With the small excep-

tion of a few words to the FBI during the raid on ADM (statements which Wilson does not seek to suppress), Wilson made no statements nor submitted to any interviews with the FBI. Simple logic dictates that self-inculpatory statements made under a plea cannot be used against Wilson if he never made any. Barrie Cox—not Wilson—rendered statements under a plea agreement. As such, *Kastigar* is not even remotely implicated by Cox' interview. For the same reasons, Wilson lacks standing to enforce Cox's *Kastigar* rights assuming they had been violated. *See generally, Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

■■■ Wilson's argument that he is a third-party beneficiary to ADM's 11(e)(6) interim grant of immunity is equally unpersuasive. To bolster his argument, Wilson selectively quotes portions of two October 11, 1996 letters prepared by the Department of Justice addressed to William Taylor, Cox's attorney, and ADM counsel Aubrey M. Daniel. The letters simply and succinctly informed Taylor and Daniel that Cox, under a grant of immunity pursuant to 18 U.S.C. § 6001, was scheduled to submit to an interview with the DOJ to determine his knowledge of the price-fixing conspiracy. As is plainly evident from the face of the October 11 letters, the government gave ADM interim immunity against Cox's statements under Rule 11(e)(6) in exchange for its assistance in prosecuting the lysine conspiracy in terms of "investigati[ng] . . . allegations that *individuals and companies in the citric acid and in the lysine industry . . .* [provided] Mr. Cox is truthful and complete in providing information during the interview, the United States and ADM *will execute the contemplated plea agreement.*"

The letters made it patently clear that Cox's testimony and cooperation was a precondition to the execution of the then prospective ADM plea agreement. During the interim between negotiations and ratification of a plea, the government extended use immunity pursuant to Fed.R.Crim.P.

11(e)(6) to ADM, agreeing not to use any information derived from Cox's interview immunity based on Cox's interview. Hence, Cox's testimony was clearly made in contemplation of a plea on behalf of ADM.

Since the ADM plea agreement expressly excludes Andreas and Wilson, Wilson turns to the October 11 letter for protection, claiming that but for the letter Cox would not have testified. He further argues that the October 11 letters' "employee protection clause" extended to Wilson since he was still an ADM executive at the time, thereby rendering him a third-party beneficiary to ADM's 11(e)(6) protection embodied in the October 11 letter. Assuming for the sake of argument, that the employee protection clause is ambiguous, the surrounding circumstances clarify that neither Wilson nor Andreas were intended beneficiaries of the plea agreement.

■■■ Plea agreements are governed by ordinary contract principles and extrinsic evidence is inadmissible to determine a contract's meaning unless it is ambiguous on its face. *United States v. Ingram,* 979 F.2d 1179, 1184 (7th Cir.1992). Plea agreements are construed in their entirety with the purpose of effectuating all of their provisions in a consistent manner. *United States v. Rourke,* 74 F.3d 802, 807 (7th Cir.1996). Nonetheless, "disputed terms . . . are to be determined by the district court by objective standards." *United States v. Ataya,* 864 F.2d 1324, 1331 (7th Cir.1988). Even if the employee protection clause conflicts with the contemplated plea agreement clause, the resulting ambiguity compels the court to ascertain the parties' intent from extrinsic circumstances surrounding the formation of the agreement. *Ingram,* 979 F.2d at 1184; *Ataya,* 864 F.2d at 1330. The extrinsic evidence could not be clearer: ADM was cutting a plea in exchange for naming names, and Andreas and Wilson were primary targets. At that point, whether reliable or not, the government had information from audio and videotapes

that Andreas and Wilson were at the bottom of this and they were targeted for prosecution. The court declines to belabor this point any further. ADM and Cox got cover and Andreas and Wilson did not.

Accordingly, Wilson's motion to suppress Cox's testimony for violation of *Kastigar* or of his purported third-party beneficiary rights to the ADM's Rule 11(e)(6) interim agreement is denied with prejudice.

## 2. Cox's testimony regarding citric acid

 Both Andreas and Wilson assert that admission of Barrie Cox's testimony deprived them of a fair trial, arguing that his testimony regarding the alleged citric acid conspiracy was used as impermissible propensity evidence against both of them in violation of Fed.R.Evid. 404(b). First, they contend that the citric acid evidence was not direct evidence establishing the existence of the lysine conspiracy. In support, they argue that the lysine and citric acid are two distinct markets and that citric was relevant solely to show the defendants' propensity to violate the law. In addition, Andreas separately challenges the admissibility of the citric acid renewing his claim that the government did not properly notify him of its intent to admit Barrie Cox's testimony regarding citric acid against him.

The government opposes the motions, arguing that Andreas received notice of the government's intent to use the citric acid as direct evidence to convict Andreas of the lysine conspiracy. It further contends that Barrie Cox's testimony was admissible to establish the existence of the alleged citric acid evidence to prove that Andreas and Wilson intended to pattern the lysine conspiracy on ADM's previously established citric acid conspiracy, and not to show criminal propensity.

 Rule 404(b) prohibits the introduction of evidence of extrinsic acts reflective of the defendants' character unless it is probative or relevant to the defendants' knowledge, motive, intent, and opportunity to commit the charged offense. Fed. R.Evid. 404(b); *Huddleston v. United States*, 485 U.S. 681, 685, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988); *United States v. Kellum*, 42 F.3d 1087, 1093 (7th Cir.1994). For purposes of Rule 404(b), similar act evidence is relevant only if the jury could conclude that the act occurred and that the defendant was the actor. *Huddleston*, 485 U.S. at 689, 108 S.Ct. 1496. In the Seventh Circuit, 404(b) evidence is admissible if it: (1) is directed toward establishing a matter in issue other than the defendants' propensity to commit the crime charged; (2) shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) is sufficient to support a jury finding that the defendant committed the similar act; and (4) meets the Rule 403(b) balancing test—the prejudicial effect of the evidence does not substantially outweigh the probative value. *United States v. Long*, 86 F.3d 81, 83 (7th Cir.1996); *Kellum*, 42 F.3d at 1093, n. 3, *citing United States v. Wilson*, 31 F.3d 510, 514 (7th Cir.1994); *United States v. Evans*, 27 F.3d 1219, 1232 (7th Cir. 1994).

 As the government argued and the court previously held, the citric acid evidence was not subject to the proscriptions of 404(b) because it simply was not evidence of other bad acts. Evidence of prior bad acts is admissible without implicating Rule 404(b) where, as here, it is directly related to the charged offense. *United States v. Adames*, 56 F.3d 737 (7th Cir.1995); Citric acid evidence was admissible because it arose from a series of transactions related to the lysine conspiracy and helped to explain the context of the conspirator's conduct shown in the numerous audio and video tapes presented at trial. *United States v. Roberts*, 933 F.2d 517, 520 (7th Cir.1991). The evidence adduced at trial, in the form of Cox's testimony, co-conspirator testimony, and the audio and video tapes, demonstrated that the

lysine conspiracy was patterned on the citric acid conspiracy. Cox's testimony established that he and Wilson were involved in the citric scheme; Wilson teaching Cox how to handle the conspiracy and deal with competitors. Cox implicated Andreas by stating that Wilson reported developments in and progress of the citric acid conspiracy to Andreas personally. Recorded conversations between Whitacre, Andreas, and Wilson revealed that Andreas and Wilson assented to Whitacre's suggestions that by allocating sales volume in a manner similar to that previously employed with citric acid, the competitors could police the lysine conspiracy to ensure that competitors did not secretly circumvent the price agreement and sell lysine at discounted prices. Andreas and Wilson argued that Whitacre fooled them to make innocent comments which he contorted into incriminating evidence by selectively taping and destroying exculpatory conversations. That argument turns on credibility which the jury rejected and the court cannot disturb.

■ Even assuming that citric acid was not direct evidence, it was permissibly used to show that *all* of the defendants— Andreas, Wilson, and Whitacre—possessed the intent to conspire, *Kellum,* 42 F.3d at 1093; established the nature and context of the lysine conspiracy; *United States v. Sanders,* 979 F.2d 87, 90 (7th Cir.1992); and placed the participant's conversations into context to establish the formation and identify conspiracy's goals. *United States v. Prevatte,* 16 F.3d 767, 776 (7th Cir.1994). By establishing that sales volume allocation was utilized in citric acid, the government was able to place Andreas discussion of sales allocation at the 1993 Irvine meeting into context. Wilson is memorialized on video tapes along with Whitacre and Andreas, discussing prices and making references to citric acid and lysine.

Any propensity challenges are easily dispatched since, as shown above, the evidence had the relevant alternative purpose to prove Andreas' and Wilson's intent agree and indeed, follow through with their agreement to fix lysine prices. Both Andreas and Wilson vehemently, by virtue of their vigorous examination of witnesses and concomitant argument, contended throughout the trial that they never intended to agree or otherwise participate in illegal activities thereby placing their intent directly at issue. The citric acid evidence disproves those assertions by demonstrating that they were aware of the citric scheme and knowingly intended to model the lysine scheme after it.

■ Wilson objects to admissibility claiming that the citric and lysine markets are far too distinct and different to satisfy 404(b)'s similarity prong because: (1) ADM and competitors disputed price more often than in the citric conspiracy; (2) the competitors distrusted each other more than in lysine; (3) unlike citric acid, lysine involved more conspirators who schemed to increase the price of animal food instead of "people food." Negligible differences like those articulated by Wilson cannot defeat a jury conviction based on admission of 404(b) evidence. Since the citric acid evidence was admitted to show knowledge and intent, "the prior acts need not be duplicates of the one for which the defendant[s are] now being tried." *United States v. Long,* 86 F.3d 81, 84–85 (7th Cir.1996). The similarity requirement is satisfied when prior acts share common characteristics that relate to the purpose for which the evidence is offered. *Long,* 86 F.3d at 85. Here, the citric acid evidence proved that the corporations were selling a similar, but not identical, food additive to a large market. They used a phony trade association which produced sham agendas discussing environmental and animal rights issues as a front to conceal their scheme fix lysine prices. As alleged with citric acid, a sales volume allocation agreement was used to police the price agreement.

■ Andreas renews his objection over the introduction of citric acid evidence

claiming that the government never declared its intent to introduce it as prior bad acts evidence under 404(b). The record reveals that Andreas' arguments are wholly without merit. In a March 14, 1997 letter to Andreas' counsel, the government indicated that it intended to introduce evidence concerning the alleged citric acid conspiracy against Andreas, asserting that in its opinion, the citric acid evidence was direct evidence of the lysine conspiracy not subject to Rule 404(b). Nonetheless, Andreas was fully and reasonably informed of the nature of the evidence and thus, is foreclosed from claiming a violation of Rule 404(b)'s notice requirement.

■ Finally, introduction of the citric acid evidence was not unfairly prejudicial in violation of Fed.R.Evid. 403. Citric acid evidence did prejudice Wilson and Andreas in the sense that it strengthened the weight of all the evidence of their guilt. Rule 403 compels the exclusion of unfair evidence that invokes horror or emotional responses causing the jury to base its decision on considerations apart from the evidence. *Adames,* 56 F.3d at 742, *citing United States v. Peters,* 791 F.2d 1270, 1295 (7th Cir.1986), *cert. denied* 479 U.S. 847, 107 S.Ct. 168, 93 L.Ed.2d 106 (1986); *see also* 2 J.Weinstein & M. Berger, Weinstein's Evidence § 403.04[1]. That was not the case here. Accordingly, Andreas' and Wilson's motions for judgment of acquittal and for a new trial based on the introduction of Barrie Cox's testimony and evidence regarding citric acid are denied with prejudice.

### D. Exclusion of Andreas' and Wilson's proposed jury instructions

Andreas and Wilson challenge the exclusion of certain proposed jury instructions, asserting that the court violated their Fifth Amendment right to apprise the jury of valid theories of defense supported by the case law. In support of their motion, they further argue that the court's general instruction as to the law governing conspiracy and intent did not adequately apprise the jury of their "theory of defense." The government opposes both motions, asserting that neither Andreas' nor Wilson's jury instructions were instructions, but rather legal argument which attacked evidence adduced at trial which is improperly presented in the form of jury instructions. Specifically, the government contends that both Andreas and Wilson sought to confuse and mislead the jury regarding governing law, by attempting to instruct the jury that lack of intent to follow through with the lysine conspiracy is tantamount to finding that the defendants never formed an actual agreement to conspire to price-fix.

■ "[D]efendants in a criminal case [are] entitled to have the jury consider any theory of the defense which is supported by the law and which has some foundation in the evidence, however, tenuous." *United States v. Douglas,* 818 F.2d 1317, 1320 (7th Cir.1987), *citing United States v. Boucher,* 796 F.2d 972, 975 (7th Cir.1986) (internal citations omitted). That right, however, does not entitle defendants to have a particular instruction; rather the defendant is only entitled to have his theory *presented* to the jury. *Douglas,* 818 F.2d at 1320. A theory of defense instruction is permissible only if the defendant satisfies four requirements: (1) the proposed jury instruction is a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial. *United States v. Brown,* 136 F.3d 1176, 1184 (7th Cir.1998).

Andreas' and Wilson's theory of defense was that they lacked intent to join or agree to join the lysine conspiracy. They tendered, in their opinions, proposed jury instructions which accurately instructed the jury to acquit if they found that either defendant lacked intent to join the conspiracy.

 Andreas' proposed instruction 19,19(b) and Wilson's proposed instruction 29 were properly excluded because they injected confusing references to contract law which could mislead the jury to believe that the agreement to conspire did not exist if the parties did not intend to comply with all of its objectives. Unlike standard criminal conspiracies, liability attaches under Sherman Act conspiracies based solely on the agreement—regardless of whether or not overt acts were committed in furtherance of the conspiracy, conspirators' second thoughts over participation, or disagreement as to the overall objective. *Coleman v. Cannon Oil Co.*, 849 F.Supp. 1458, 1465 (M.D.Ala.1993). The mutuality of purpose language created the false impression that the conspirators formed a formal contract which precludes Sherman liability if any of the participants agreed to reap benefits of the agreement, but secretly planned not to honor all of the conspiracy objective. The Sherman Act requires no formal agreement and antitrust precedent has permitted juries to infer the existence of a conspiracy from evidence of a mere "gentlemen's agreement." 6 Phillip E. Areeda, Antitrust Law ¶ 1404, 18–20 (1986),[7] *citing United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

Omitting the "mutuality of purpose" language, alone, was an insufficient remedy since the instructions were redundant in the first instance. The court instructed the jurors that they had to find that each of the defendants knowingly and intentionally became a member of the conspiracy, and that the defendants must be acquitted if the government had not adequately proved the intent element. No additional instruction was necessary to inform the jury to acquit if they found that Andreas and Wilson lacked the requisite intent to conspire. Accordingly, Andreas' proposed instructions 19 and 19(b) and Wilson's proposed instruction 29 were redundant and failure to submit them to the jury did not violate Andreas' or Wilson's Fifth Amendment right to present a theory of defense.

 Similarly, Andreas' proposed instruction 20 was redundant. It told the jurors to acquit if they believed that the defendants' action was indicative of legal conduct. The government characterizes Andreas 20 and Wilson 29 as "dual hypothesis" instructions which encourage acquittal if the jury is tied between innocence or guilt and is prohibited in the Seventh Circuit. *United States v. Johnson*, 515 F.2d 730 (7th Cir.1975); *see also* § 3.02 Fed. Crim. Jury Instr. 7th Cir. (1980). Both Wilson and Andreas contend that their respective instructions are supported by *United States v. Bestway Disposal Corp.*, 724 F.Supp. 62 (W.D.N.Y.1988). *Bestway* is, as the government contends, distinguishable since it was a non-jury trial in which the judge articulated his analysis of the facts in evidence and not how the jury should be instructed. Indeed, the judge in *Bestway* merely held that the government had not produced sufficient evidence to prove intent beyond a reasonable doubt. Here, the court instructed the jury as to the government's burden to prove guilt beyond a reasonable doubt after reviewing all the evidence. Hence, the jurors were fully aware that they could acquit Andreas if they believed that his actions were legal. Accordingly, Andreas' proposed instruction 24 and Wilson's proposed instruction 29 were properly excluded.

 Finally, Andreas proposed instruction 24 and Wilson proposed instruction 30 were purely argumentative. Andreas and Wilson presented their interpretation of the facts adduced at trial. The instructions are completely devoid of any law. Hence, Andreas and Wilson

---

**7.** At oral argument, Wilson's counsel implied that Professor Areeda was some obscure antitrust scholar who did not carry any persuasive weight. However, Professor Areeda's scholarship has been cited by the U.S. Supreme Court in approximately 40 opinions since 1968. In other words, Areeda is to antitrust what Professor Wayne R. LaFave is to criminal procedure, and his opinions should not be lightly dismissed.

were not entitled to this instruction. *Brown,* 136 F.3d at 1184 (7th Cir.1998). Accordingly, Andreas' and Wilson's motions for judgment of acquittal and for a new trial based on exclusion of jury instructions as to their theories of defense, are denied with prejudice.

### E. Whitacre's claim

■ Defendant Whitacre raises only one challenge to his conviction. He argues that he must be acquitted because the evidence established that he did not have an adequate window of opportunity to participate in the lysine conspiracy. Specifically, he asserts that since he only had authority to legally bind ADM for approximately four days prior to cooperating with the government, he had no opportunity to violate § 1.

This same argument was rejected in *United States v. Wise,* 370 U.S. 405, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962). The *Wise* Court construed the "every person" clause of § 1 to confer liability upon individual corporate officers under the Sherman Act even if they act without corporate authorization as long as they possess the requisite elements of the offense—knowing participation in the conspiracy. *Wise,* 370 U.S. at 416, 82 S.Ct. 1354. The record is replete with evidence from which a rational trier of fact could infer Whitacre possessed the requisite intent to violate § 1— prior to his cooperation with the government's investigation—and find him guilty beyond a reasonable doubt. Accordingly, his motions for a judgment of acquittal and new trial are denied with prejudice.

### V. *CONCLUSION*

For the reasons set forth above, the motions of Michael D. Andreas, Mark E. Whitacre, and Terrance S. Wilson for judgments of acquittal and for new trials are denied with prejudice. Absent good cause, the court shall not alter or delay the imposition of sentence which is scheduled for February 28, 1999.