In the
# United States Court of Appeals
## For the Seventh Circuit

No. 24-1030

IN THE MATTER OF: BROILER CHICKEN ANTITRUST LITIGATION

BOSTON MARKET CORPORATION, *et al.*,

*Class Members-Appellants*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 8637 — **Thomas M. Durkin**, *Judge*.

ARGUED SEPTEMBER 17, 2024 — DECIDED APRIL 1, 2025

Before EASTERBROOK, HAMILTON, and MALDONADO, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. In this long-running and complex class action, plaintiffs contend that many corporations trading in the market for broiler chickens violated the antitrust laws. The class asserts that they did this in two principal ways: by agreeing on the prices to be quoted ("bid rigging") and by reducing the supply of broilers available for sale. (A third way, which the parties call the "Georgia Dock" allegations, need not be discussed.)

In the economics of antitrust, bid rigging and supply re-
duction amount to the same thing. If producers form a cartel
that sets higher prices, then sales will fall because demand is
lower at the higher price. If instead the cartel cuts supply, then
buyers bid up the price of the remaining goods. Whether the
cartel controls the price directly or the output directly, or does
a little of each, the profit-maximizing position for the cartel is
the same volume of sales at the same price. See, e.g., *FTC v.
Superior Court Trial Lawyers Association*, 493 U.S. 411, 423
(1990); *General Leaseways, Inc. v. National Truck Leasing Associ-
ation*, 744 F.2d 588, 594–95 (7th Cir. 1984); Richard A. Posner,
*Economic Analysis of Law* ch. 7 (1972).

In the law of antitrust, these two methods have different
names, but both methods of operating a cartel violate §1 of the
Sherman Act, 15 U.S.C. §1. As the district court observed
when denying defendants' motion for summary judgment,
the suit boils down to a contention that two anomalous dips
in the sales of broiler chickens must have been caused by col-
lusion with respect to price, output, or both. 702 F. Supp. 3d
635, 648 (N.D. Ill. 2023).

Because the class action entails so many different entities,
the district court sought to simplify matters by allowing the
class (effectively, the lawyers representing the class) to put
different theories and different defendants on "Track 1" or
"Track 2." The different tracks have different timelines for
summary judgment. Claims on Track 1 omit bid-rigging alle-
gations in exchange for faster discovery and trial. Track 2 in-
cludes not only bid-rigging theories but also some claims un-
der state law by indirect purchasers, which was among the
factors complicating discovery. On December 21, 2021, the
class put claims against defendants Simmons Foods, Inc., and

Simmons Prepared Foods, Inc. (collectively "Simmons") on Track 1. Once assigned to Track 1, Simmons settled its part of the suit for $8 million.

Several members of the class (the "Boston Market group") objected to this settlement, which required judicial approval under Fed. R. Civ. P. 23(e). The Boston Market group is disaffected not so much by the size of the settlement as by the fact that its members are in the class at all. They filed their own antitrust suits, which remain pending. They were entitled to opt out of the class and pursue their own claims, Fed. R. Civ. P. 23(c)(2)(B)(v), which would have been unaffected by the settlement with Simmons. About 130 restaurants or restaurant chains, including McDonald's, did opt out. But members of the Boston Market group missed the deadline for excluding themselves from the class. They are therefore stuck with the settlement, now that the district judge has approved it, unless we overturn the district court's conclusion that the settlement is a reasonable compromise. If the settlement stands, the separate suits by members of the Boston Market group cannot proceed.

The court entered a partial final judgment under Fed. R. Civ. P. 54(b), allowing the Boston Market group to appeal. They offer two principal arguments: first, that the settlement cannot cover bid-rigging theories, which the class abandoned by putting the claim against Simmons on Track 1; second, that $8 million is just too little to reflect the value of the released claims. Both of these themes lack punch.

First, the release in the settlement is as broad as can be. It resolves "all claims that have been asserted, or could have been asserted, in the Action against [Simmons], including all claims in any way arising out of or relating to the direct

purchase of Broilers produced, processed, or sold by Simmons or any of the other Defendants or their alleged co-conspirators." Bid rigging is covered by this language.

In other words, the settlement is an ordinary one. Defendants settle to buy peace. As the Boston Market group sees things, however, all the Simmons defendants bought was a fistful of additional lawsuits—all the separate suits that the Boston Market group had on file. Nothing in either the language of the release or the goal of settlement supports this position. Many decisions hold that it is proper to release claims that were brought and then abandoned earlier in a suit—or never brought at all. E.g., *Tropp v. Western-Southern Life Insurance Co.*, 381 F.3d 591, 595–96 (7th Cir. 2004); *Oswald v. McGarr*, 620 F.2d 1190, 1198 (7th Cir. 1980); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982).

Second, the Boston Market group has not supplied any evidence that $8 million is an unreasonably low value for the released claims (including bid rigging). The Boston Market group could have hired an expert to assess the likely recovery against Simmons if the class prevailed in full, and discount that by the risk that the class would lose. If that number came in substantially higher than $8 million, that would fuel an argument against the district court's approval of the settlement. But the Boston Market group did not do this. There is some evidence of this kind bearing on other settlements, but none bearing on the settlement with Simmons. Nor is there any evidence addressing the *marginal* value of a bid-rigging theory, compared with a supply-reduction theory alone. The record thus does not undermine the district court's conclusion that $8 million is a reasonable settlement.

The judge observed that one of the Track 1 cases went to trial shortly after Simmons settled, and the class lost that case outright. Victory against Simmons therefore could not have been assured. On a related front, the United States brought two criminal antitrust prosecutions, one against many of the firms' executives (*United States v. Penn*, No. 20-CR-00152-PAB (D. Colo.)) and another against two of the firms (*United States v. Norman W. Fries, Inc.*, No. 21-CR-00168-RM (D. Colo.)). The latter was dismissed in 2022 without a trial. The former went to trial three times. The first two ended in mistrial. The third, with the list of defendants cut down to five, ended in acquittal. It is of course possible that there was a cartel but that the criminal prosecutions were foiled by the steep burden of proof beyond a reasonable doubt. Still, there is uncertainty about the civil plaintiffs' prospects. It may well be that obtaining $8 million from Simmons is a coup for the class. We have not seen anything that would paint the district court's reasonableness finding as a clear error or abuse of discretion.

The Boston Market appellants trot out some other theories, such as a contention that the named class representatives do not have the interests of restaurant plaintiffs at heart and that the Rule 23(b)(3) notice was inadequate to alert appellants to all legal consequences of the Track 1 election. The Boston Market group submits that, by filing stand-alone suits, they constructively opted out of the class, which is absurd. Everyone is entitled to know with certainty who is in and who is out; the opt-out procedure does this with due formality. The district court did the Boston Market Group a big favor by treating their belated protest about membership in the class as an opt-out going forward, while not affecting settlements and other decisions already reached. They are not entitled to

retrospective relief too. We have considered other contentions but need not discuss them further.

AFFIRMED